**WELCH SAND & GRAVEL, INC. et al., Appellants,**

v.

**O & K TROJAN, INC. et al., Appellees.**

[Cite as *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.* (1995), 107 Ohio App.3d 218.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–940331.

Decided Nov. 1, 1995.

*Strauss & Troy* and *Larry A. Temin,* for appellant Welch Sand & Gravel, Inc.

*Vozar, Roberts & Matejczyk* and *Thomas J. Vozar,* for appellant Aetna Life & Casualty Company.

*Vogel, Heis, Wenstrup & Cameron* and *Daniel J. Wenstrup,* for appellant Ohio Casualty Insurance Company.

*Droder & Miller* and *A. Dennis Miller,* for appellee O & K Trojan, Inc.

*Rendigs, Fry, Kiely & Dennis, Edward R. Goldman* and *Fern Theresa Schmitz,* for appellee Brandeis Machinery & Supply Corp.

---

MARIANNA BROWN BETTMAN, Judge.

In December 1986, the owners of plaintiff-appellant Welch Sand & Gravel, Inc. ("Welch") attended an auction to purchase a used Trojan 5500 front-end loader, manufactured by defendant-appellee O & K Trojan ("Trojan"). Prior to the auction, the auctioneer, Forke Brothers ("Forke"), sent an advertising circular to Welch. Forke's ad listed defendant-appellee Brandeis Machinery and Supply Corp. ("Brandeis") as consignee of certain equipment placed for sale at the auction, including the Trojan loader.

■ The ad listed the loader as a one-owner machine in very good condition.[1] Welch purchased this loader "in reliance" on the ad's statement of its condition. However, Welch was aware that the auction sold all of the equipment "as is—where is."[2] Welch bought the loader and used it for seventeen months without incident.

On May 9, 1988, the loader was idle for routine maintenance. The bucket had been removed and a tire repaired. Welch's employees left at 5:00 p.m. Just before 9:00 p.m., a neighbor saw the loader on fire. The fire destroyed the loader, a maintenance shed, and the vehicles and equipment inside the maintenance shed. Plaintiff-appellant Aetna Life & Casualty Insurance Company ("Aetna") insured the building, the vehicles and much of the equipment inside the building. The remaining equipment was uninsured. Plaintiff-appellant Ohio Casualty Insurance Company ("Ohio Casualty") insured the loader. Both insurers paid indemnification according to their obligations for the losses and are now subrogees in this lawsuit. Welch is suing for its uninsured losses.

---

1. The ad defined "very good condition" as follows: "In exceptional condition. May have been overhauled or may never have been used enough to require overhaul."

2. "As is—where is" disclaims any express or implied warranty or prior representation. James Welch, who represented Welch at the auction, stated that he understood that the term meant that he would have no recourse as to mechanical defects. By separate affidavit, however, he stated that he did not believe the disclaimer applied to dangerous defects.

During the investigation by the insurance companies, experts discovered that the origin of the fire was a short circuit caused by a twelve-volt wiring harness connected to a twenty-four-volt power source. Trojan's expert agreed that the short circuit was the origin, but added that Trojan loaders always left the factory with twenty-four-volt wiring harnesses to prevent short circuits. It is undisputed that no one knows who modified the electrical system on the loader. Welch and each previous owner denied making the modification.[3]

Welch, Aetna and Ohio Casualty ("appellants") initially filed suit against Trojan, Brandeis, Forke and Switzer to recover damages pursuant to the Ohio Product Liability Act, R.C. 2307.71 *et seq.* The appellants dismissed Forke with prejudice. The trial court dismissed Switzer for lack of personal jurisdiction. Brandeis and Trojan moved for summary judgment against all appellants. The appellants moved for summary judgment against Brandeis. The trial court granted summary judgment to Trojan. The court held first that the modification occurred after the loader left Trojan's control, and therefore that no manufacturing defect existed. Second, the court held that the appellants brought forward no evidence that the modification was foreseeable to Trojan, and therefore that no design defect existed. Third, the court held that Trojan's evidence showed that it provided a warning regarding modifications, that the appellants presented no evidence to show that the warning provided was inadequate, and therefore that the warning provided was adequate. The trial court also granted summary judgment to Brandeis, concluding that there was no evidence that Brandeis's representations were a proximate cause of the fire, that Brandeis had no duty to maintain the loader during the short time it possessed the loader, and that Brandeis could not be substituted for the manufacturer under R.C. 2307.78 because the only entity meeting the definition of manufacturer was Trojan, which was already present in this case. The appellants have appealed the summary judgment granted to Trojan and Brandeis.

The appellants raise three assignments of error. First, they argue that the trial court improperly granted summary judgment to Trojan. Second, they argue that the trial court improperly granted summary judgment to Brandeis. Third, they argue that they are entitled to summary judgment against Brandeis as a matter of law.

In their first assignment of error, appellants argue that the trial court erred by granting summary judgment to Trojan because the evidence raises questions of

---

3. The owner that sold to Welch through Brandeis is John Switzer Excavating & Used Equipment ("Switzer"). In an affidavit, Switzer denied modifying the loader.

fact over the existence of a design defect, specifically a foreseeable alteration of the loader, and the lack of an adequate warning to prevent any such alteration.[4]

■ Turning first to the issue of a design defect, all parties agree that someone altered the loader in such a way as to constitute misuse of the product. While a manufacturer is not responsible for all product misuses, failure to design a product to prevent a foreseeable misuse can be a design defect. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 15 OBR 179, 472 N.E.2d 707. Therefore, we must determine whether Trojan could have foreseen this misuse, and if so, whether Trojan could have prevented the harm resulting from the misuse with an economically viable design. We agree with appellants that the record demonstrates questions of fact on these issues.

■ The appellants correctly state that a product is considered defective in design if either the foreseeable risks associated with the design exceed the benefits associated with that design, or the product is more dangerous than an ordinary consumer would expect when used in a reasonably foreseeable manner. See R.C. 2307.75(A) and 2307.75(B).

■ A product is not defective in design if an inherent characteristic of the product caused the harm and cannot be eliminated without substantially compromising the usefulness of the product in the eyes of an ordinary person. R.C. 2307.75(E). A product is not defective in design if no technically feasible alternative design existed at the time the product left the manufacturer's control that would have prevented the harm, unless the product is unreasonably unsafe. R.C. 2307.75(F).

■ A manufacturer must neither anticipate all product uses nor guarantee that the product is incapable of causing injury in all of its possible uses. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 15 OBR 179, 472 N.E.2d 707, syllabus. Only "those circumstances which [the manufacturer] perceived or should have perceived at the time of its * * * actions should be considered." *Id.* at 77, 15 OBR at 181, 472 N.E.2d at 710.

■ The foreseeable risks associated with the design of a product are determined by considering, among other factors, "the likelihood that the design would

---

4. Contrary to the trial court's ruling, the appellants did not allege the existence of a manufacturing defect that caused the fire to occur. The appellants did not dispute the fact that Trojan did not sell the loader with a twelve-volt wiring harness or a twelve-volt appliance connected to the twenty-four-volt power source. Appellants' expert pointed out many manufacturing defects in his deposition, but none is related in any way to the twelve-volt wiring harness, which is the item that all parties agree caused the fire.

cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product." R.C. 2307.75(B)(3).

■ If a design defect exists, it must also be shown that the manufacturer sold the defectively designed product and that the defect was the proximate cause of the harm. *State Farm Fire & Cas. Co. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 523 N.E.2d 489.

■ Summary judgment is appropriate only where a product is used in a capacity which is clearly unforeseeable by the manufacturer and completely incompatible with the product's design. *Cox v. Oliver Mach. Co.* (1987), 41 Ohio App.3d 28, 534 N.E.2d 855. Foreseeable uses of a product, foreseeable risks associated with a product, benefits associated with a product, and consumer expectations regarding a product's uses and risks are ordinarily all factual questions. The determination whether a design defect exists involves a balancing of these factual issues. Therefore, summary judgment will rarely be granted in design-defect cases when any of these elements is disputed.

In this case, Trojan argues that the modification was not foreseeable. However, Richard Besser, Trojan's own engineer and expert witness, admitted that Trojan could have anticipated that a user might install a twelve-volt radio or other appliance on the loader. Both experts in this case testified that it is common knowledge in the industry that users of heavy equipment sometimes equip their machines with twelve-volt accessories, which the appellants have identified as a potential cause of the fire. Besser also testified that there was no circuit-breaker protection for the circuitry between the batteries and the starter motor in the event that someone installed a twelve-volt wiring harness instead of the proper twenty-four-volt wiring harness.

■ Trojan further argues that it followed applicable Society of Automotive Engineers ("SAE") standards when installing the circuitry. While following SAE standards can be evidence in support of the safety of a design to withstand liability under a negligence theory, but not a strict-liability theory, it is not conclusive to defeat a design-defect claim. See R.C. 2307.75(B)(4); *Kelley v. Cairns & Bros.* (1993), 89 Ohio App.3d 598, 626 N.E.2d 986.

■ Finally, Trojan argues that a manufacturer cannot be held liable for alterations that constitute a substantial change to the machine. See *Stombaugh v. Natl. Lime & Stone Co.* (Jan. 15, 1991), Wyandot App. No. 16–89–18, unreported, 1991 WL 3600; *Kobza v. Gen. Motors Corp.* (1989), 63 Ohio App.3d 742, 580 N.E.2d 47. However, the courts in these cases held only that the manufacturer could not be held strictly liable solely for the modifications themselves. See, also, *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267. A manufacturer can still be held liable if the

product design is found defective because the modifications were foreseeable, reasonably preventable with a feasible design, and proximately caused by the failure to use such a design. *Cox, supra.*

Appellants' evidence has raised a question of fact about whether the twelve-volt circuitry was foreseeable by the manufacturer, or whether it was completely incompatible with the product's design. *Cox, supra.* Appellants have further presented evidence raising a question of fact about whether some other feasible design could have prevented the fire through the use of a fuse, a circuit-breaker or some other design. For these reasons, summary judgment was improperly granted in favor of Trojan on the design-defect claim.

■ Appellants also argue that Trojan failed to provide an adequate warning against the addition of twelve-volt circuitry to operate twelve-volt appliances when connected to a twenty-four-volt power source.

■ Trojan provided inadequate warnings if it knew or reasonably should have known of the risk in the exercise of ordinary care and failed to take precautions that a reasonable person would take in presenting the product to the public. R.C. 2307.76(A)(1); *Crislip v. TCH Liquidating Co.* (1990), 52 Ohio St.3d 251, 556 N.E.2d 1177. This standard is identical whether it is applied to a strict-liability claim or to a negligence claim. *Crislip, supra.*

We note at the outset that the appellants allege only a failure to warn against the installation of a twelve-volt appliance. Therefore, in order to find an inadequate warning, the factfinder must find that a twelve-volt appliance caused the fire, because the appellants do not allege an inadequate warning for the replacement of the circuitry between the starter motor and the batteries.

As indicated above, both experts in this case testified that it is common knowledge in the industry that users of heavy equipment sometimes equip their machines with twelve-volt accessories. The delivery inspection report for the loader contained a provision that warned the customer and operator "against modification to the machine or installation of attachments or subassemblies which may make [the] machine unsafe due to changing or exceeding design specifications." However, there is a genuine issue of fact whether that warning, which was part of the delivery of the loader to its first owner on November 8, 1981, was reasonably calculated to reach end users such as Welch. If this same warning had been in the operator's manual, it would have been more likely to reach an end user than a warning in a delivery inspection report, and Trojan would have a stronger argument in support of summary judgment on the appellants' inadequate-warning claim. However, the operator's manual for the loader is inexplicably absent from the record.

Assuming that a twelve-volt appliance caused the fire, appellants have presented evidence raising a genuine issue of material fact whether Trojan knew or reasonably should have known of the risk and warned against it in a manner that would have provided notice to product users such as Welch. For these reasons, summary judgment was inappropriate on the inadequate-warning claim against Trojan.

Because we hold that the existence of a foreseeable product alteration, the existence of a design defect relating to the foreseeable alteration, and the lack of an adequate warning are genuine issues of material fact, we sustain the first assignment of error.

In the second assignment of error, appellants argue that the trial court erred by granting summary judgment to Brandeis because the evidence demonstrates the existence of factual issues on supplier liability.

To address this assignment of error, we must first determine whether Brandeis is definitionally a supplier, and if so, whether there are any bases for the imposition of supplier liability.

Brandeis is a limited agent for used machines under consignment agreements. The parties in this case apparently agree that the issue of whether a dealer in used goods is subject to strict liability as a supplier is a question of first impression in Ohio. R.C. 2307.71(O)(1)(a) makes no distinction between new and used goods.

We turn first to the issue of whether, as appellants allege, Brandeis fits the definition of a supplier under the Ohio products liability statute. Suppliers are defined in R.C. 2307.71(O)(1) subject to the restrictions of R.C. 2307.71(O)(2). R.C. 2307.71(O)(1)(a) defines a supplier as a person that, in the course of business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce. None of the exceptions to the definition of supplier in R.C. 2307.71(O)(2) applies to Brandeis. Brandeis did not sell, distribute, lease, prepare, blend, package, or label the loader. To hold that Brandeis is a supplier under R.C. 2307.71(O)(1), we must determine that Brandeis "otherwise participated" in placing the loader in the stream of commerce. To answer this question, we look to prestatutory precedent and to the public policy underlying the products liability statute.

The Supreme Court of Ohio followed 2 Restatement of the Law 2d, Torts (1965), Section 402A in developing the Ohio's product liability law. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267. Section 402A imposes strict liability on sellers of products that cause harm to users. In *Anderson v. Olmsted Util. Equip., Inc.* (1991), 60 Ohio St.3d 124, 573

N.E.2d 626, another prestatute decision, the Supreme Court of Ohio interpreted Section 402A and held that a "sale" occurs when a product is placed in the stream of commerce. *Id.,* paragraph one of the syllabus. Brandeis concedes that Ohio law does not limit strict liability to actual sales, but argues that it merely facilitated the sale of a product which was already injected into the stream of commerce.

In *Anderson,* the court declined to limit supplier liability to an actual sale in the traditional sense, and expressly cited with approval several decisions extending strict liability to nonsale situations, including free loans of equipment, demonstrations, commercial leases and free samples. *Id.,* 60 Ohio St.3d at 128–129, 573 N.E.2d at 630–631. Exchange of title was not relevant in the *Anderson* court's "stream of commerce" approach. The only relevant question was whether the "seller" facilitated placing the product into the stream of commerce.

In each of the situations cited by the *Anderson* court, the "seller" derived a benefit from the "sale," and the "seller" was in a better financial and technical position than the user to ensure against risk from defects. *Id.,* 60 Ohio St.3d at 129, 573 N.E.2d at 631. In this case, Brandeis clearly derived a benefit from the sale of the loader under the consignment agreement. While we can agree that a bailor, lessor, or consignor is in a better financial and technical position than the user to ensure against risk from defects, this rationale is less clear when applied to consignees. Therefore, the policy rationale behind the decision in *Anderson* is not as strong when applied to these facts. Compare *Slone v. Bowlus Trucking Co.* (Sept. 25, 1992), Huron App. No. H–91–031, unreported, 1992 WL 238641, discretionary appeal not allowed (1993), 66 Ohio St.3d 1419, 607 N.E.2d 842. Nevertheless, under the statute we merely inquire whether Brandeis facilitated the placing of the product into the stream of commerce to determine whether Brandeis was a supplier.

In its very limited capacity as consignee, Brandeis facilitated the sale of the loader to Welch. While it is a long reach to include a consignee of used goods in the definition of "supplier," the clear public policy behind the products liability statute is to shift the risk of product-related injury away from the product consumer. *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.* (1995), 73 Ohio St.3d 609, 621, 653 N.E.2d 661, 674–675; 2 Restatement of the Law 2d, Torts (1965), Section 402A, Comments *c* and *f.* By making the loader available at auction, Brandeis participated in placing the loader into the stream of commerce. Therefore, Brandeis is a supplier under the broad definition in R.C. 2307.71(O)(1).

We next turn to the theories by which appellants seek to hold Brandeis liable as a supplier under R.C. 2307.78. Under Ohio's statutory products liability law:

"[T]he independent liability of a supplier is limited to two situations, both of which involve active supplier conduct causing or contributing to the claimant's injury. The first of these situations is supplier misrepresentation * * *. The

other independent products liability exposure assigned by statute is for the supplier's own negligence." O'Reilly and Cody, Ohio Products Liability Manual (1992), Sections 13.03, 13.04.

In addition to these two independent bases for liability, the Ohio statute assigns liability to a supplier as if it were the manufacturer where the manufacturer is unavailable, meaning insolvent or not amenable to service of process in Ohio, or where the supplier fails, upon request, to assist in locating the product manufacturer.

We will first examine the two independent bases of liability alleged against Brandeis, misrepresentation and negligence.

Appellants argue that the product did not conform to the supplier's representations, and that Brandeis should be held liable under R.C. 2307.78(A)(2). R.C. 2307.78(A)(2) holds suppliers liable when a material misrepresentation proximately causes harm. A bidder attending an auction has a right to rely on the representations of the auctioneer. *Pugh v. Chesseldine* (1841), 11 Ohio 109, 124.

Brandeis incorrectly represented that the loader was a one-owner machine. However, this misrepresentation was in no way connected to, much less the cause of, the defect. Brandeis also represented that the loader was in "very good condition." The record demonstrates, however, that Welch knew that the loader was being sold "as is—where is." James Welch stated that he understood the term meant that he would have no recourse as to mechanical defects. Thus, Welch did not detrimentally rely on the "very good condition" representation.

Even if Welch did rely on the "very good condition" representation by Brandeis, the trial court correctly held that any representation by Brandeis could not have been the proximate cause of the fire. "Very good condition" did not mean "never modified." The definition in the brochure stated that "very good condition" meant "in exceptionally good mechanical condition, may have been overhauled or may never have been used enough to require overhaul." Contrary to the thrust of Welch's argument on this point, "may have been overhauled" suggests that the loader may have been modified.

Appellants did not produce any evidence to suggest that Brandeis had misled Welch with regard to the condition of the loader, as they were obliged to do in order to demonstrate the existence of a factual dispute and to avoid summary judgment. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. Thus, Brandeis cannot be held liable for misrepresentation under R.C. 2307.78(A)(2) and summary judgment was proper as to this theory.

■ Next, appellants argue that Brandeis failed to maintain the product and should be held liable under R.C. 2307.78(B)(6). However, we again note that the burden was on appellants to come forward with some evidence in the face of Brandeis's motion for summary judgment to demonstrate a factual dispute on the issue of negligence. This they have not done. There is no evidence in the record that Brandeis was under any duty to maintain the loader, or that it assumed such a duty and performed that duty negligently. Brandeis simply had to make the loader available at the auction.

■ Even if Brandeis were obliged to perform maintenance on the loader, any failure would not be a proximate cause of the defect. This is not a case of brake failure because of worn pads, or engine damage because of no oil. The defect was caused by the installation of a twelve-volt harness. The appellants presented no evidence to suggest that Brandeis installed the harness. Brandeis presented evidence that it did not install the harness. Therefore, Brandeis cannot be held liable under R.C. 2307.78(B)(6), and summary judgment was proper as to this theory.

■ Finally, we turn to appellants' argument in which they seek to hold Brandeis liable as if it were a manufacturer under R.C. 2307.78(B). Unlike the independent bases for supplier liability, this theory is really a "substitution" theory, holding one party liable in the stead of a potentially culpable but absent party. Appellants argue that Brandeis should be held liable because it could not identify the manufacturer of the "modified product" or alternatively because it identified a manufacturer that was not subject to judicial process in Ohio. This argument is completely without merit.

The Ohio Supreme Court has held that a manufacturer includes "one who rebuilds a product or a component of a product," but only in the context that the rebuilder is a person engaged in a business to rebuild products. See *Anderson, supra.* In the case at bar, the only manufacturer that meets this definition is Trojan. Trojan is subject to judicial process in Ohio, and is a party to this case. Thus, Brandeis cannot be held liable under R.C. 2307.78(B)(1) and (B)(2) and summary judgment was proper as to this theory.

For the foregoing reasons, summary judgment was appropriately granted to Brandeis, and we overrule the second assignment of error.

In their final assignment of error, appellants argue that the trial court erred by overruling appellants' joint motion for summary judgment against Brandeis because Brandeis failed to raise a genuine issue of material fact regarding Brandeis's liability as a supplier of a defective product, entitling appellants to judgment as a matter of law. For the reasons stated in response to the second

assignment of error, summary judgment against appellants and in favor of Brandeis was proper, and this assignment of error is overruled.

In summary, we hold that (1) summary judgment in favor of Trojan on the design-defect claim was improperly granted; (2) summary judgment in favor of Trojan on the inadequate-warning claim was improperly granted; (3) Brandeis is definitionally a supplier under R.C. 2307.71(O); (4) summary judgment in favor of Brandeis on the independent bases of misrepresentation and negligence was appropriately granted; (5) summary judgment in favor of Brandeis on the basis of R.C. 2307.78(B) was appropriately granted; and (6) summary judgment was properly denied to appellants on their claims against Brandeis.

Accordingly, we affirm the summary judgment entered by the trial court in favor of Brandeis; we reverse the summary judgment entered by the trial court in favor of Trojan and remand this cause for further proceedings consistent with this opinion on the claims of inadequate warning and design defect asserted against Trojan.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

GORMAN, P.J., and DOAN, J., concur.