**Gary TEKAVEC, Plaintiff,**

v.

**VAN WATERS & ROGERS, INC., et al., Defendants.**

**No. 5:97 CV 0571.**

United States District Court, N.D. Ohio, Eastern Division.

June 30, 1998.

---

674

Mark L. Wakefield, Gregory S. Scott, Lowe, Eklund & Wakefield, Cleveland, OH, for plaintiff.

Thomas M. Parker, Rweewnxw A. Finn, Roetzel & Andress, Akron, OH, for Van Waters.

Steven K. Kelley, Law Offices of Steven K. Kelley, Independence, OH, for Russell Stanley West.

Orville L. Reed, III, David P. Bertsch, Buckingham, Doolittle & Burroughs, Akron, OH, for Smurfit Plastic Pkg.

*MEMORANDUM OPINION & ORDER*

DOWD, District Judge.

## I.  INTRODUCTION

The plaintiff Gary Tekavec ("Tekavec") alleges that, while working as an employee of Proto Circuit, he was injured when a 55–gallon plastic drum of oxidizing chemicals exploded.  In his Amended Complaint (Docket No. 23) he seeks damages against three defendants:  Van Waters & Rogers, Russell Stanley West, Inc. ("Russell Stanley"), and Smurfit Plastic Packaging, Inc.

In his first claim for relief, Tekavec alleges that Van Waters & Rogers is a manufactur-er, as defined in Ohio Revised Code § 2307.71, which "designed, formulated, produced, created, made, and/or packaged" the 55–gallon drum.  Tekavec further alleges that the drum was defectively designed and manufactured.  In his fourth claim for relief, Tekavec charges Van Waters & Rogers with negligence in failing to:

A.  Package the hydrogen peroxide in conformity with applicable Government standards.

B.  Properly inspect, handle, maintain and/or transport the barrel in which it delivered hydrogen peroxide to plaintiff's employer.

Tekavec's second and third claims for relief assert causes of action against the other defendants for the defective design and manufacture of the drum under the Ohio Products Liability Act, R.C. § 2307.71 *et seq.*

Van Waters & Rogers filed a motion (Docket No. 34) for summary judgment on February 17, 1998.  Tekavec filed a brief (Docket No. 39) in opposition and Van Waters & Rogers filed a reply brief (Docket No. 41).  Each party then filed supplements (Docket Nos. 44, 46) to their briefs.  The motion of Van Waters & Rogers is now at issue.

For the reasons set forth below, the Court GRANTS Van Waters & Rogers' motion (Docket No. 34) for summary judgment with respect to all of Tekavec's claims.  The case will proceed only on Tekavec's claims against the remaining defendants, Russell Stanley and Smurfit Plastic Packaging, Inc.

## II.  BACKGROUND FACTS

### A.  Stipulated Facts

The parties filed a fact stipulation (Docket No. 33) on February 17, 1998 which states as follows:

1.  The fifty-five (55) gallon drum containing hydrogen peroxide that is the subject of this lawsuit was contaminated while in the exclusive possession, custody, and control of plaintiff's employer, Proto Circuits, Inc.

2.  The contaminates referred to in the previous paragraph chemically reacted

with the hydrogen peroxide in the 55–gallon drum.

3. The chemical reaction caused the pressure inside the drum to increase.

### B. Additional Facts

Van Waters & Rogers is a seller of industrial chemicals, including hydrogen peroxide. (Vansil Aff. ¶¶ 4, 7). Van Waters & Rogers receives products from various manufacturers either in bulk or in prepackaged form. *Id.* They then repackage the products that they receive in bulk in containers of various sizes. (Vansil Aff. ¶ 5).

Hydrogen peroxide is delivered to Van Waters & Rogers in two forms: a solution containing 50% hydrogen peroxide, and a solution containing 35% hydrogen peroxide. (Vansil Aff. ¶ 8). The product is not tested in any way after it arrives at Van Waters & Rogers. (Vansil Dep. at 37). The 50% hydrogen peroxide solution (hereinafter "solution") is received by Van Waters & Rogers from a tanker truck. (Vansil Dep. at 34). The tanker truck brings in approximately 45 gallons of the solution at a time, and the solution is put into a storage tank at Van Waters & Rogers. (Vansil Dep. at 35).

The storage tank has a 7,500 gallon capacity. *Id.* The tank is above ground and has a valve on the bottom that is used to withdraw the solution when necessary for packaging and shipment to Van Waters & Rogers' customers. (Vansil Dep. at 39–40). The tank also has a secondary valve for safety purposes. (Vansil Dep. at 39).

The company that supplies Van Waters & Rogers with the solution transfers the solution from its tanker truck to Van Waters & Rogers' storage tank.[1] The tanker truck is equipped with its own pumps, hoses and lines dedicated specifically to the transfer of hydrogen peroxide. (Vansil Dep. at 38). The solution is "drummed" into the tank by a hose. *Id.* The solution then remains in the tank until it is drawn out for packaging purposes. Nothing is added to nor extracted from the solution by Van Waters & Rogers' employees during the time that the solution remains in storage. (Vansil Dep. at 53).

When Van Waters & Rogers fills a customer's order, the "repackers" take the solution from storage and place it into drums for transport. (Vansil Dep. at 40). They clean the drums before filling the order and relabel the drums if necessary. *Id.*

The type of drum used for repackaging depends on the needs of the customer. The customer may request the solution in either a "one-way" drum or an "asset" drum. (Vansil Dep. at 47). The "one-way" drum may transport a solution only once. In contrast, the "asset" drum is a reusable container designed specifically for a certain chemical. *Id.* at 46. The customer may purchase the product in an asset drum and will receive a partial refund for the return of the drum. *Id.* The asset drums are then cleaned and returned to the inventory for future use by another customer.

Each of the asset drums used by Van Waters & Rogers has two threaded holes on top that are designed to accept "bungs" which come with the drum. (Vansil Dep. at 24). A "bung" is "the main closure that seals off the threaded portion of the drum." *Id.* at 24. One of the bungs has a "vent plug" in the center that is put into the bung before the bung is put into the drum. *Id.* at 23. The bung contains a hole in the center where the "vent plug" is placed. *Id.* at 25. After the repackers fill the drum, the two "bungs" are then placed in the top of the drum. *Id.* at 23. The employees of Van Waters & Rogers accomplish all of this assembly before shipment of a product order.

The drum at issue in the instant case was a 55–gallon "Act II" asset drum that Van Waters & Rogers purchased from Russell Stanley. (Vansil Aff. ¶ 16). Van Waters & Rogers received this drum in a shipment of 287 "Act II" drums that were delivered on October 31, 1996. *Id.* at ¶ 21. The 287 "Act II" drums were entered into Van Waters & Rogers' perpetual inventory record[2] for empty

---

1. Van Waters & Rogers currently receives its hydrogen peroxide from Degussa. Prior to January of 1997, Van Waters & Rogers received its hydrogen peroxide from DuPont. (Vansil Aff. ¶ 7).

2. The perpetual inventory record identifies the number of drums in inventory, and the on-site

drums on November 8, 1996. *Id.* at ¶ 23. Van Waters & Rogers filled twelve of these drums, including the drum Tekavec alleges was defective, with the 50% hydrogen peroxide solution and added them to the hydrogen peroxide inventory on November 14, 1996. (Vansil Aff. ¶ 24). Van Waters & Rogers removed a drum from this inventory on December 31, 1996. *Id.* at ¶ 26. Van Waters & Rogers shipped this drum, along with a drum of ammonium hydrogen peroxide, to Proto Circuit[3] on January 2, 1997. *Id.* at ¶ 27. This was the last drum of hydrogen peroxide shipped to Proto Circuit before January 16, 1997. *Id.* at ¶ 28. Tekavec has produced no facts to suggest that this drum had been used before its shipment to Proto Circuit.[4]

The 50% hydrogen peroxide drum that Proto Circuit received was kept in the Plating Room. (Swank Dep. at 31–32). At approximately 10:00 p.m. on the evening of January 16, 1997, Tekavec was walking through the plating room toward another portion of the Proto Circuit facility. (Tekavec Aff. ¶ 2). He noticed a drum "leaning away" from the wall against which it was placed. *Id.* Tekavec thought something was wrong with the drum and began to turn away to report it to his superiors. *Id.* At the same moment, the drum exploded and showered Tekavec with hydrogen peroxide. *Id.* The hydrogen peroxide burned Tekavec's feet, and he was rendered blind for several days. *Id.*

Tekavec's expert, Mr. Tamny, inspected the drum. (Tamny Aff. ¶ 1). Mr. Tamny observed that the drum had a 10½ inch vertical tear on the bottom third of the drum. (Tamny report at 1, Plaintiff's Exhibit "E"). Mr. Tamny further observed that the thickness of the drum in the surrounding area was only 0.060 inches, well below the required minimum thickness of 0.087 inches (or 2.2 mm.). *Id.* at 2. Mr. Tamny concluded that the explosion did not cause this defect, but was present before the incident. *Id.* Mr. Tamny also concluded that this decrease in thickness would result in a rupture at an internal pressure of approximately 17 pounds per square inch ("psi"), which is well below the normal 35 to 40 psi. *Id.*[5]

The "Act II" drum is the only asset drum that Van Waters & Rogers uses for transporting hydrogen peroxide solutions. (Vansil Dep. at 51). Van Waters & Rogers has ordered between 3,000 and 4,000 of these "Act II" drums from Russell Stanley during the last five years. (Vansil Aff. ¶ 31). Van Waters & Rogers has stated that it is unaware of any defects existing in the "Act II" drums that it has purchased from Russell Stanley. *Id.* at 32. Further, Van Waters & Rogers notes that Russell Stanley stamped

location of these drums. These records are filled out and maintained as part of the regular course of Van Waters & Rogers' business. (Vansil Aff. ¶ 22).

3. Proto Circuit is the employer of Tekavec. (Tekavec Aff. ¶ 2). Proto Circuit makes various circuit boards for a variety of applications. Part of Proto Circuit's operations include plating copper as well as various other metals. (Swank Dep. at 7). Hydrogen peroxide is used by Proto Circuit as an oxidizing agent in a cleaning operation involving the removal of copper residue from the electroless copper tank. (Swank Dep. at 8).

4. Tekavec alleges that the statements in the affidavit by Mr. Vansil pertaining to the alleged prior use of the drum at issue in this case are contrary to the testimony given by him during his deposition. In his affidavit, Mr. Vansil concluded that the drum had never been used before. (Vansil Aff. ¶ 29). Tekavec asserts that this conclusion is inconsistent with Mr. Vansil's testimony in his deposition that he "could not answer the question" of whether the drum had been used before. (Vansil Dep. at 61). However, as

Van Waters & Rogers points out, Mr. Vansil answered the questions based on the information he had before him. (*See* Vansil Aff. ¶ 30). At the time he was deposed, he was unaware of the date when the drum at issue was first pressed into service. *Id.* In the affidavit, Mr. Vansil refers to numerous records which were not before him at the deposition, and which led him to the conclusion that the drum was not used prior to being shipped to Proto Circuit. (*See* Attachments 3–7 of Vansil Aff.). Tekavec has not challenged the authenticity of these records, nor has he produced any records of his own that indicate that the drum was used prior to shipment to Proto Circuit.

5. Federal Regulations require that a plastic "asset" drum of the type used by Van Waters & Rogers have a minimum drum wall thickness of at least 2.2 mm. *See* 49 C.F.R. § 178.503; 49 C.F.R. § 173.28. This required thickness allows the drum to withstand an internal pressure of between 35 and 40 psi. (Tamny report at 2).

the drum wall thickness on the surface of the drums. (*See id.* ¶ 19 and Attachment 2).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). *See, e.g., U.S. v. Hodges X–Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an ˙ otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves ...." *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548 (equating the standard for judgment as a matter of law under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam* ) and *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20

L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

## IV.   ANALYSIS

### A.   Introduction

■■■ These claims are before this Court pursuant to diversity jurisdiction under 28 U.S.C. § 1332. When deciding a diversity case under state law, a federal court must apply the law of the state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Garden City Osteopathic Hospital v. H.B.E. Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995). "A federal court is not free to engraft onto ... state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the state in which the federal court sits." *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir.1997). Where the Ohio Supreme Court has not spoken, the task of the federal court is to discern the state law from all relevant data. *Garden City Osteopathic Hospital*, 55 F.3d at 1130. Relevant data includes, *inter alia*, the decisions of state courts of appeals, the dicta of the state supreme court, and the restatements of law. *Id.*

■■■ The decisions of state courts of appeals on issues of state law are normally treated as authoritative. *In re Akron–Cleveland Auto Rental*, 921 F.2d 659, 662 (6th Cir.1990). A federal court may refuse to follow an intermediate state appellate court where it is persuaded that the appellate deci-

sion fails to reflect state law correctly, but federal courts "should not reject the state rule just because it was not announced by the highest court of the state, 'even if [the federal court] believe[s] that the rule is unsound.' " *Ziebart Intl. Corp. v. C.N.A. Insurance*, 78 F.3d 245, 251 (6th Cir.1996) (quoting *F.L. Aerospace v. Aetna Casualty & Sur. Co.*, 897 F.2d 214, 219 (6th Cir.), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990)).

### B.   Manufacturer Liability

Tekavec first alleges that Van Waters & Rogers is a manufacturer under the Ohio Products Liability Act, R.C. §§ 2307.71–2307.80. Tekavec contends that Van Waters & Rogers "remanufactures" its product by combining the drum, the vent, and the 50% hydrogen peroxide solution into one product. These actions, Tekavec asserts, make Van Waters & Rogers a "manufacturer" under Ohio law.

### 1.   Applicable Law

Ohio Revised Code § 2307.71(I) defines a manufacturer as, "[a] person engaged in a business to design, produce, create, make, construct, assemble, or rebuild a product or a component of a product." The Ohio Supreme Court has stated that "an entity is a manufacturer if it assembles components into a design which creates a product." *Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 270, 617 N.E.2d 1068.

Under Ohio's products liability statutory scheme, it is helpful to consider the definition of a supplier when deciding whether a defendant falls within the definition of a manufacturer, since these two definitions are mutually exclusive. *See Brown v. McDonald's Corp.* (Lorain 1995), 101 Ohio App.3d 294, 297, 655 N.E.2d 440. A supplier is defined as a "person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce ...." *See* R.C. § 2307.71(P)(1)(a). The definition of a supplier does not include a manufacturer. *See* R.C. § 2307.71(P)(2)(a).

This Court has not found, nor have the parties cited to, any controlling authority from the Ohio Supreme Court on Tekavec's claim that the definition of a "manufacturer" includes a person who combines several unmodified products solely for the purpose of distribution. Van Waters & Rogers, however, cites to *Vercellotti v. YMCA of Greater Toledo*, 1992 WL 95368 (Ohio App. 6 Dist.) in support of its argument that these actions, without more, do not fall within the statutory definition of a manufacturer. While this unreported appellate decision does not bind this Court (*See* discussion in part A *supra* ), in light of the factual similarities, and in the complete absence of any contrary legal authority, the Court finds *Vercellotti* to be particularly instructive.

■ In *Vercellotti*, the defendant HVC–Daly, Inc. acquired chlorine in bulk and redistributed the chlorine in canisters equipped with hook-up valves. *Vercellotti*, 1992 WL 95368 at \*3. The plaintiff there argued that HVC–Daly was a manufacturer because it: (1) pressurized the liquid chlorine; (2) filled metal canisters with the pressurized chlorine; and (3) assembled the canisters by installing a valve on the top of the canister. *Id.* The *Vercellotti* court held that these acts compelled the holding that HVC–Daly was a supplier under Ohio law because it merely packaged the chlorine for resale. *Id.* at \*4. In Ohio, the fact that an entity is a supplier precludes it from being considered a manufacturer. *Brown*, 101 Ohio App.3d at 297, 655 N.E.2d 440.

## 2. Discussion

■ The facts in the instant case are analogous to those in *Vercellotti*. Van Waters & Rogers' activities were limited to cleaning the drums, filling the drums with the 50% hydrogen peroxide solution, and replacing the bungs in the drum with a valve attached. These activities are consistent with the definition of a supplier under R.C. § 2307.71(P)(1) since they represent mere preparation, packaging, or participation in placing the product on the market. *See Vercellotti*, 1992 WL 95368 at \*5. As discussed above, the definition of a "supplier" specifically excludes a person classified as a "man-

ufacturer," and this Court is therefore precluded from reading R.C. § 2307.71(I) broadly enough to include the conduct of Van Waters & Rogers. *See Brown*, 101 Ohio App.3d at 297, 655 N.E.2d 440. Therefore, the Court holds that as a matter of law the defendant Van Waters & Rogers is a supplier and not a manufacturer.

■ As an alternative argument, Tekavec contends that even if Van Waters & Rogers is defined as a "supplier" instead of a "manufacturer," it may still be subject to the manufacturer liability sections of the Products Liability Act under R.C. § 2307.78(B)(7). That section of the Act provides that persons defined as suppliers will be held liable as if they were the manufacturers of a product where "[t]he supplier marketed that product under its own label or trade name." There is nothing in the record cited by Tekavec, nor found by this Court, to suggest that Van Waters & Rogers marketed its drums of hydrogen peroxide on the open market under a "trade name." Instead, Tekavec alleges that Van Waters & Rogers is liable under this subsection because the drum contained several labels and warning stickers that bore Van Waters & Rogers' name. Van Waters & Rogers, on the other hand, states that those labels were required by law, and therefore cannot give rise to liability.

Again, this Court has found no controlling authority from the Ohio Supreme Court on point on this issue, and Tekavec has failed to cite any authority in support of his position. Van Waters & Rogers, however, again cites *Vercellotti*, 1992 WL 95368 at \*5, for the proposition that warning labels required by law are not a "marketing scheme" for which a supplier could be held liable as a manufacturer under R.C. § 2307.78(B)(7). Van Waters & Rogers states that it is obligated under Department of Transportation ("DOT") regulations and regulations adopted by the Occupational Safety and Health Administration ("OSHA") to place warnings on hazardous chemical drums. *See* 49 C.F.R. § 172.301; 49 C.F.R. § 172.400; 49 C.F.R. § 172.426; and 29 C.F.R. § 1910.1200(b)(1). Van Waters & Rogers then argues that under the reasoning of *Vercellotti*, its compliance with the labeling requirements cannot

give rise to liability under R.C. § 2307.78(B)(7).

The Court finds the holding of *Vercellotti* persuasive, and holds that the mere fact that Van Waters & Rogers placed their name on the labels as required by law does not give rise to liability under the Ohio Products Liability Act, R.C. § 2307.78(B)(7). The more expansive reading of R.C. § 2307.78(B)(7) suggested by Tekavec would extend liability to a supplier who has complied with federal law and placed warning labels on its product. This would go a long way toward erasing the dichotomy between manufacturer and supplier liability that the Ohio legislature has attempted to create. *See* R.C. § 2307.71(P)(1)(a) (specifically excluding a manufacturer from the definition of a supplier); R.C. § 2307.78 (generally defining a limited number of circumstances under which a supplier may be held liable).[6]

Therefore, the Court holds that Van Waters & Rogers is entitled to summary judgment with respect to Tekavec's manufacturer liability claims.

### C.  Supplier Liability

Tekavec also argues that Van Waters & Rogers may be held liable as a supplier under Tekavec's first claim for relief. Initially, the Court notes that Tekavec did not use the term "supplier" or refer to R.C. § 2307.78, which attaches liability to suppliers as defined in R.C. § 2307.71(P)(1), in either his Complaint or Amended Complaint (Docket No. 23). However, even if the Court construes the complaint to include a claim for supplier liability, Tekavec's claim would still fail as the record is utterly devoid of any factual allegations that would sustain such a claim.

As explained in part B *supra*, Van Waters & Rogers meets the statutory definition of a supplier. Under Ohio R.C. § 2307.78(A)(2) one who meets the statutory definition of a "supplier" may be held liable as a supplier where "[t]he product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm ...." This Court has not found, nor have the parties cited to, any controlling authority from the Ohio Supreme Court on the issue of what conduct is sufficient to constitute a representation under R.C. § 2307.78(A)(2). However, Ohio appellate courts have required some form of express conduct by the seller to maintain a cause of action based on a supplier's misrepresentation. *See Brown,* 101 Ohio App.3d at 302, 655 N.E.2d 440 ("[R.C. § 2307.78(A)(2) ] applies only to express representations"); *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.* (Hamilton 1995), 107 Ohio App.3d 218, 228–29, 668 N.E.2d 529 ("[the] independent liability of [a] supplier is limited to two situations, both of which involve active supplier conduct causing or contributing to the claimant's injury.").

Tekavec alleges that Van Waters & Rogers is liable for failure to conform to its "representation" that the drum wall thickness was at least 2.2 mm. (or .087 inches). The "rep-

---

6. Tekavec argues in his brief (Docket No. 39) in opposition that the distinction between a manufacturer and a supplier in a products liability action is irrelevant. However, as this Court noted earlier, the definition of a supplier adopted by the Ohio legislature specifically excludes a manufacturer. *See* R.C. § 2307.71(P)(1)(a). The Court cannot ignore this express distinction in a diversity case where it is bound to follow state law. (*See* discussion in part A *supra*). Further, the Restatement (Second) of Torts (1965) § 402, comment d, suggests that there is a good reason for this distinction:

There is a clear distinction between the liability of a manufacturer and that of a seller of goods made by another for harm caused by a chattel made by the former and sold by the latter. The manufacturer of a dangerously defective chattel is the creator of something which is foreseeably dangerous when it is used for the purpose for which it is manufactured. The constructing of the chattel defectively, with knowledge that it is to be sent out to be used, is an unreasonably dangerous activity. On the other hand, the seller who reasonable believes that the chattel he is selling is safe for use is not, in selling and delivering the chattel, doing anything which is foreseeably likely to cause harm. The slight risk inherent in the possibility that the chattel may be defective is not sufficient to constitute an unreasonable risk. The burden on the seller of requiring him to inspect chattels which he reasonably believes to be free from hidden danger outweighs the magnitude of the risk that a particular chattel may be dangerously defective ....

resentation" at issue consists of a stamp in the plastic of the drum which states that the drum wall thickness is 2.2 mm. Tekavec's expert, Mr. Tamny, concluded that the thickness of the drum was only 0.060 inches. Tekavec further alleges that this "misrepresentation" is the proximate cause of Tekavec's injuries.

Van Waters & Rogers asserts that the drum was stamped by the drum manufacturer, Russell Stanley. (Vansil Aff. ¶ 19). Tekavec has not pointed to any statements in the record which counter this assertion, and the Court cannot find any. Tekavec does not allege that any further representation as to the thickness of the drum wall was made by Van Waters & Rogers. Therefore, since the claim for misrepresentation is based on a stamp that the undisputed facts show was placed on the drum by Russell Stanley, this Court holds that Van Waters & Rogers did not engage in any active conduct or make any express representation under which they may be held liable as a supplier. Thus, Van Waters & Rogers is entitled to summary judgment on Tekavec's first claim for relief.

### D. Negligence Claim

Tekavec's complaint also asserts a claim against Van Waters & Rogers for negligence in failing to: (a) package the hydrogen peroxide in conformity with applicable government standards (statutory negligence); and (b) properly inspect, handle, maintain and/or transport the barrel in which it delivered hydrogen peroxide to the plaintiff's employer (common law negligence).

### 1. Common Law Negligence

#### a. Applicable Law

As explained in part B *supra*, Van Waters & Rogers meets the statutory definition of a supplier. Under Ohio R.C. § 2307.78(A)(1) a supplier may be held liable for compensatory damages where the supplier "was negligent and that negligence was a proximate cause of [the] harm ...." In Ohio, the plaintiff must prove each of the following elements to establish negligence: (1) the existence of a duty; (2) a breach of that duty; and (3) an injury resulting proximately therefrom.

*Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 472 N.E.2d 707. Thus, a threshold question is whether Van Waters & Rogers owed any duty to Tekavec to inspect the drum and warn Tekavec of any defects found therein.

■ Under Ohio common law, negligence is established where a person has knowledge of a latent defect rendering a product unsafe and fails to provide a warning of such a defect. *See Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 325, 364 N.E.2d 267. The parties have not cited, nor can this Court find, any controlling authority from the Ohio Supreme Court on the issue of whether the presence of such knowledge, or a reason to know, is necessary in order to establish a duty by the seller to inspect a product and to warn the customer of any defects contained therein. However, § 402 of the Restatement (Second) of Torts states:

> A seller of a chattel manufactured by a third person who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it.

The position of the Restatement has been adopted by at least one Ohio appellate court. *See Brown,* 101 Ohio App.3d at 302, 655 N.E.2d 440; *see also Buchman v. QVC, Inc.,* 1998 WL 12332 *2 (Ohio App. 8 Dist.) (citing *Brown* ). Tekavec has not cited any Ohio case law that is to the contrary, and the Court in its own research did not find any.

#### b. Discussion

Tekavec does not allege that Van Waters & Rogers had actual knowledge of the alleged defect in the drum. Rather, Tekavec claims that because the drum was an "asset" container and could have been used by other customers, Van Waters & Rogers has a duty to inspect the drum for defects before shipment. However, the undisputed facts show that the drum sold to Proto Circuit was

never in fact used prior to sale.[7] It is therefore unnecessary to determine whether the sale by Van Waters & Rogers of a previously used drum would impose a duty to inspect the drum.

■ Instead, the proper inquiry is whether Van Waters & Rogers had a "reason to know" of the allegedly defective condition of a newly purchased drum, such that under Ohio law they would have a duty to inspect the drum. Under the facts of this case, the Court holds that Van Waters & Rogers had no "reason to know" that the product sold to them by Russell Stanley was defective. The undisputed facts demonstrate that Van Waters & Rogers had purchased thousands of drums from Russell Stanley. (Vansil Aff. ¶ 31). Van Waters & Rogers was unaware of a defect existing in any of these drums. *Id.* at ¶ 32. The drums are represented by Russell Stanley to have a drum wall thickness of 2.2 mm. *Id.* at ¶ 19. Furthermore, 49 C.F.R. § 173.22 expressly authorizes Van Waters & Rogers to rely on the representation of Russell Stanley when transporting hazardous materials. Therefore, the Court holds that Van Waters & Rogers had no duty to inspect or test the drum before selling it. *See Brown,* 101 Ohio App.3d at 302, 655 N.E.2d 440.

**2. Violation of Statutory Duties**

Tekavec also alleges that Van Waters & Rogers violated statutory duties imposed by 49 C.F.R. § 173.28 and 49 C.F.R. § 173.503 pertaining to the required thickness of the drum walls. However, for the reasons that follow the Court holds that these regulations impose no statutory duty on Van Waters & Rogers that would give rise to a negligence cause of action initiated by Tekavec.

7. *See* note 4 *supra.* As noted above, Tekavec has been unable to point to any fact contained in the record that contradicts any of the documents on which Mr. Vansil relied in his affidavit. Tekavec's objection to Mr. Vansil's assertion that the drum in question was not used prior to being shipped to Proto Circuit is based solely on his assertion that the affidavit of Mr. Vansil contradicted the testimony of his deposition. However, since the affidavit of Mr. Vansil and his deposition are not *prima facie* contradictory, Tekavec must do more than merely assert that these statements are not consistent to create an issue of

*a. Applicable Law*

■ "It is the settled law of [the State of Ohio] that where a legislative enactment imposes upon a person a specific duty for the protection of others, his failure to observe that duty constitutes negligence *per se.*" *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 56, 231 N.E.2d 870. In order to determine whether a violation of the above cited provisions of the DOT's regulations constitutes negligence *per se,* this Court must first determine whether the regulations in question were intended to affect the duties owed for the safety and protection of others. *See Wireman v. Keneco Distributors, Inc.* (1996), 75 Ohio St.3d 103, 109, 661 N.E.2d 744; *Hernandez v. Martin Chevrolet, Inc.* (1995), 72 Ohio St.3d 302, 303, 649 N.E.2d 1215.

*b. Discussion*

■ The statutory language and legislative history of the statute authorizing the DOT's regulations limit their applicability to matters of transport and not customer use. *Hurt v. Coyne Cylinder Co.,* 956 F.2d 1319, 1323 (6th Cir.1992). Congress authorized the sections of the Code of Federal Regulations cited by Tekavec under 49 U.S.C.A. § 5101 *et seq.* (The Hazardous Materials Transportation Act). Section 5101 states that "[t]he purpose of this chapter is to provide adequate protection against the risks to life and property inherent in the transportation of hazardous material in commerce by improving the regulatory and enforcement authority of the Secretary of Transportation." The enforcement provision of 49 U.S.C.A. § 5122 allows the Attorney General to bring a civil action to enforce the regulations issued under this chapter.

material fact. *Cf. Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 ("in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations of a conspiracy to get to a jury without any significant probative evidence tending to support the complaint."). Therefore, because Tekavec cannot point to any facts in the record in support of his claim that the drum might have been used before being shipped to Proto Circuit, there is no genuine issue of material fact with respect to any alleged prior use of the drum in question.

Pursuant to this grant of authority, the DOT authorized the Administrator of the Research and Special Programs Administration to "exercise powers and perform duties" relating to the Hazardous Materials Transportation Act of 1975. *See* 49 C.F.R. § 1.53(b). The Administrator then put forth 49 C.F.R. § 171.1 *et seq.* under the grant of authority from the DOT. 49 C.F.R. § 171.1(a)(1) states that the regulations that follow prescribe requirements governing "the offering of hazardous materials for transportation and transportation of hazardous materials ...." Put simply, the regulations cited by Tekavec do not evince an intent to create a private cause of action for a customer who purchases hazardous materials. To the contrary, they establish the clear intent of Congress and the DOT to enact regulations to be followed during the transportation of materials that are to be enforced by the public at large through the Attorney General. Therefore, under Ohio law Tekavec cannot establish a cause of action for negligence *per se.*

As a result, since Van Waters & Rogers had no duty to inspect the drum prior to shipping it to Proto Circuit, and since the cited regulations do not create a private cause of action for the customer who purchases hazardous materials, the Court holds that Van Waters & Rogers is entitled to summary judgment as a matter of law with respect to Tekavec's fourth claim for relief.

### V. CONCLUSION

For the reasons set forth above, the motion (Docket No. 34) of the defendant Van Waters & Rogers for summary judgment is GRANTED. As a result, the case will proceed on Tekavec's second and third claims for relief against the remaining defendants: Russell Stanley and Smurfit Plastic Packaging Inc.

The Court will conduct a status conference on July 16, 1998 at 8:30 a.m. in the Akron Courthouse for the purpose of scheduling this case for trial.

IT IS SO ORDERED.