OPINION
{¶ 1} Plaintiff-appellant, James Griffith, the administrator of the estate of Gary Lynn Griffith, appeals from a judgment of the Columbiana County Common Pleas Court in favor of defendant-appellee, Chrysler Corporation, following a jury trial.
 {¶ 2} On October 26, 1992, at approximately 2:00 a.m. Ruth Sevek observed her neighbor Gary Lynn Griffith sitting in his 1992 Plymouth Laser in his driveway in Salineville, Ohio. The car motor was running and the radio was playing. Gary's cousin, Charles Griffith, with whom Gary resided, also noticed Gary sitting in his car in the driveway. At approximately 3:30 a.m., Ms. Sevek heard a change in the noise coming from Gary's car. She looked out her window and saw the underside of Gary's Laser glowing and flames shooting from the vehicle. Ms. Sevek's roommate, Ron Pucci, ran outside and over to the Laser. By the time Pucci got to the Laser, it was on fire. At the same time, Charles awoke and looked out his window. He saw Gary swatting his right arm, which was on fire. Charles ran outside. By the time Gary got out of the Laser, the flames had spread along his arm and over his back. Pucci pushed Gary down and threw dirt on him to put out the fire.
 {¶ 3} Although no witness could state for certain how the fire occurred, the evidence adduced at trial revealed the most likely scenario. Gary was sitting in the Laser listening to music with the car running when he either passed out or fell asleep. While he was passed out/asleep, Gary must have pressed his foot down on the accelerator causing the temperature in the exhaust system to rise. A fire began under the car in the area of the exhaust system due to high temperatures igniting various rubber combustibles. The parties dispute how long it took before the fire began. The fire spread to the interior of the car through a hole in floor pan on the rear passenger side. Gary was probably reclining in the driver's seat with his elbow resting on the center console. The fire spread to Gary's right arm, which would have been closest to the rear passenger side of the car.
 {¶ 4} Gary was taken to the East Liverpool City Hospital and then to West Penn Hospital. Doctors took a blood sample from him at 7:47 a.m., which revealed a blood alcohol concentration of .086 milligrams per deciliter and a diphenhydramine[1] level of .04 micrograms per millimeter. An expert opined that at the time of the fire, Gary would have had a blood alcohol content of .15 milligrams per deciliter and a diphenhydramine level between .05 and .08 micrograms per millimeter.
 {¶ 5} Gary died on November 5, 1992, from complications of his burns. Appellant filed this complaint on January 6, 1997 against appellee and several other defendants. Appellant asserted a strict product liability action alleging a design defect, a manufacturing defect, and a failure to warn. He sought damages for Gary's wrongful death, pain and suffering, loss of consortium for Gary's children, and various medical and funeral expenses. The parties eventually dismissed the other defendants and the case proceeded solely against appellee.
 {¶ 6} Appellant filed a motion in limine to prohibit appellee from introducing, among other things, evidence of Gary's blood alcohol and diphenhydramine levels. The court ruled that appellee could use this information only with a proper scientific foundation to support its theory of unforeseeable misuse.
 {¶ 7} The case proceeded to a jury trial on September 18, 2000. Over appellant's objections, the trial court instructed the jury on the defenses of unforeseeable misuse and superseding intervening cause. On September 29, 2000, the jury returned a verdict in favor of appellee and the court entered judgment accordingly. Appellant filed a motion for a new trial, which the trial court denied on November 6, 2000. On November 30, 2000, appellant filed a timely notice of appeal.
 {¶ 8} Appellant now raises six assignments of error, the first of which states:
 {¶ 9} "The trial court erred and materially prejudiced the appellant by permitting `unforeseeable misuse' as a defense, and by giving Chrysler's requested instruction on `unforeseeable misuse' in appellants [sic.] strict product liability personal injury claim brought pursuant to H.B. 1 as enacted January 5, 1988."
 {¶ 10} Appellant filed a motion to limit the use of evidence of Gary's alcohol and diphenhydramine concentration and to limit the use of any evidence that Gary misused the Laser. The trial court ruled that unforeseeable misuse of a product is a defense in a strict product liability case. (September 7, 1999 Judgment Entry). It determined that whether a misuse is foreseeable is a question of fact for the jury. The court ruled appellee could present evidence of its theory that Gary passed out asleep in the Laser because of alcohol and antihistamine ingestion and that his foot must have pushed against the accelerator as long as appellee laid the proper scientific foundation. At numerous times prior to trial appellant attempted to persuade the trial court to change its ruling.
 {¶ 11} Appellant breaks this assignment of error down into two subsections. The first subsection states:
 {¶ 12} "O.R.C. 2307.71 to 2307.80, together with other statutes that were enacted on January 5, 1988 and otherwise known as H.B. 1, preempts all common-law claims and common law defenses that were incorporated within the purview of Ohio's product liability statutes."
 {¶ 13} Appellant argues that R.C. 2307.71 to R.C. 2307.80 (the Products Liability Act) preempts appellee's unforeseeable misuse defense. Appellant notes that R.C. 2315.20(C) abolished the defense of contributory negligence in strict products liability cases. He contends that unforeseeable misuse is just another way of asserting contributory negligence. Therefore, the court erred in permitting appellee to raise this defense. Appellant asserts that unforeseeable misuse was a viable defense under common law. But he contends that with the enactment of H.B. 1 in 1988 this defense was abolished. He asserts that we must draw a distinction between those causes of action that arose before the enactment of H.B. 1 and those that arose after its enactment. Appellant contends other courts that have upheld the unforeseeable misuse defense have failed to consider this distinction. Appellant also compares this case to Sutowski v. Eli Lilly Co. (1998), 82 Ohio St.3d 347. InSutowski, the Ohio Supreme Court held that the Products Liability Act does not provide for the market-share theory of liability; thus, the plaintiff could not bring such an action. Appellant argues by analogy that since unforeseeable misuse is found nowhere in the Products Liability Act, it is not permitted as a defense.
 {¶ 14} Appellant is correct in stating that R.C. 2315.20(C) abolished contributory negligence as a defense to products liability claims, except under certain circumstances involving suppliers. Furthermore, the Code does not explicitly refer to the defense of unforeseeable misuse.
 {¶ 15} Nevertheless, the Code requires a product liability plaintiff to prove forseeability. The Act defines a "foreseeable risk" as one that is "associated with an intended or reasonably foreseeable use * * *." R.C. 2307.71(F)(1). R.C. 2307.75(A), which governs claims for design defects, states that a product is defective if, "[w]hen it left the control of its manufacturer, the foreseeable risks associated with its design or formulation * * * exceeded the benefits associated with that design or formulation" or it "is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable
manner." (Emphasis added.) Thus, in order to rebut a plaintiff's claim that a product fits this definition and is defective in its design, the defendant would necessarily argue the risks associated with the product were unforeseeable or that the consumer used the product in anunforeseeable manner. Since the plaintiff must prove forseeability as an element of its case, it is only logical that if the defendant proves unforeseeability, it will prevail. To prevent a defendant from doing so would preclude it from presenting a legitimate defense to the claim against it.
 {¶ 16} Thus, the first subsection of appellant's first assignment of error lacks merit.
 {¶ 17} The second subsection of appellant's first assignment of error states:
 {¶ 18} "Alternatively, the instruction on `unforeseeable misuse' should not have been given because the facts and circumstances developed at the trial did not support the giving of such instruction, particularly in light of the court's error in failing to exclude evidence of Griffith's intoxication."
 {¶ 19} Appellant contends the evidence did not support an unforeseeable misuse instruction. He argues that appellee's experts did not perform their tests on an exemplar 1992 Plymouth Laser under the same circumstances as when Gary operated his Laser. Additionally, appellant asserts that the Laser's manual did not warn against operation of the Laser at the "rev limiter" nor did the vehicle prohibit such action. Appellant argues that it is foreseeable, as a matter of law, that a motorist might sit in a parked vehicle with the motor running and fall asleep, whether due to alcohol or not. He also asserts that it is foreseeable that the motorist might inadvertently push the accelerator and not sense the engine running before a fire would develop.
 {¶ 20} The decision to give a jury instruction is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. McCleod, 7th Dist. No. 00-JE-8,2001-Ohio-3480. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. The trial court should give a requested jury instruction when the instruction is a correct statement of the law pertaining to the facts of the case and when reasonable jurors might reach the conclusion sought by the instruction. Murphy v. Carrollton Mfg. Co.
(1991), 61 Ohio St.3d 585, 591. Upon review of jury instructions, the appellate court should determine whether the record contains evidence that might lead reasonable minds to reach the conclusion sought by the instruction. Id.
 {¶ 21} The court's instruction to the jury regarding unforeseeable misuse was as follows:
 {¶ 22} "The Defendant has raised two affirmative defenses on which it bears the burden of proof.
 {¶ 23} "First, the Defendant claims that Gary Griffith misused the 1992 Plymouth Laser in a way that was not foreseeable. The test for forseeability here is whether under all of the circumstances a reasonably prudent manufacturer would have anticipated that a consumer of the product was likely to use the product in the same way that you find that Gary Griffith used the product.
 {¶ 24} "If you find by the greater weight of the evidence that Gary Griffith misused the automobile in a way that it was not foreseeable, then you will find in favor of the Defendant. If you find that Gary Griffith misused the product in a way that it was foreseeable to the Defendant, then the Defendant has not sustained its burden of proof on the issue of misuse.
 {¶ 25} "Once again, I mention that the Defendant must prove this defense to you by a preponderance of the evidence." (Tr. 1724-25).
 {¶ 26} Whether or not the court properly allowed appellee to introduce evidence of Gary's blood alcohol and diphenhydramine levels, it did not abuse its discretion by instructing the jury on unforeseeable misuse. Even without the evidence of Gary's blood alcohol and diphenhydramine levels, the instruction on unforeseeable misuse was not an abuse of discretion. Two expert witnesses, Paul Beauchamp and Mark Noble, testified that operating a stationary vehicle at rev limiter for more than a few seconds was unforeseeable. (Tr. 1155, 1387). Noble also testified that he could not conceive that somebody would run a stationary car at rev limiter for more than a few seconds. (Tr. 1387). Given this testimony, reasonable jurors might reach the conclusion that Gary's misuse of the Laser was unforeseeable to appellee.
 {¶ 27} Accordingly, the second subsection of appellant's first assignment of error lacks merit. Since both subsections of appellant's first assignment of error lack merit, appellant's first assignment of error is without merit.
 {¶ 28} Appellant's second assignment of error states:
 {¶ 29} "The court prejudicially erred in instructing the jury on the defense of intervening cause, where no intervening act interfered with the design or foreseeable operation of the motor vehicle while parked in the operators [sic.] driveway at night and when operated within its permitted performance envelope."
 {¶ 30} Appellant argues that the evidence did not warrant a jury instruction on intervening cause. He contends that continued application of the throttle was not an intervening cause because Gary operated the vehicle within its performance capacity. He further contends that it is foreseeable that someone might fall asleep, become ill, or pass out while intoxicated in a parked car with the motor running. Thus, appellant asserts it is foreseeable that if the underside of the car caught on fire, the occupant might not notice the fire in time to safely escape. Appellant argues that to allow the defense of intervening cause in such a situation is to allow the defense of contributory negligence. Appellant asserts that whether Gary's act of falling asleep in the Laser was unreasonable, careless, or negligent is of no consequence since such an act was foreseeable and could not be an intervening cause.
 {¶ 31} Gary had a blood alcohol concentration of .086 and a diphenhydramine level of .04 approximately four hours after the fire. Appellee's forensic toxicologist, Dr. Robert Forney, testified that Gary's blood alcohol content would have been approximately .15 and his diphenhydramine level would have been approximately .05 to .08 at the time of the fire. (Tr. 1032). Dr. Forney further testified that at the time of the fire, Gary would have been heavily sedated and his response to stimuli would have been impaired. (Tr. 1032, 1034). Given this testimony in addition to the evidence of how the fire began, an instruction on intervening cause was proper.
 {¶ 32} As stated above, the decision to give or refuse to give a jury instruction is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. McCleod, 7th Dist. No. 00-JE-8.
 {¶ 33} The court's instruction on superseding intervening cause was as follows:
 {¶ 34} "The Defendant also raises a defense of intervening cause. To avoid liability under this theory, the Defendant must prove by a preponderance of the evidence that the intervening cause was unforeseeable and was itself the proximate cause of the injury to Gary Griffith.
 {¶ 35} "When two independent acts combine to produce a single harmful result, and where each is a substantial factor in producing that result, both actors are responsible, unless the act of one breaks the causal connection of the other, and relieves the first of any legal responsibility for the harm.
 {¶ 36} "The causal connection is broken when a subsequent act, or failure to act intervenes and completely removes the effect of the first act, and is itself then the proximate cause of the injuries.
 {¶ 37} "The causal connection of the first act is broken and superseded by the second, only if the intervening act is both new and independent.
 {¶ 38} "The word independent means, in this context, the absence of any connection or relationship of cause and effect between the first act and the subsequent act.
 {¶ 39} "New means that the second act could not reasonably have been foreseen.
 {¶ 40} "If the party who committed the first act foresaw, or should have foreseen the probability of the conduct of the second, and the probability that the first act and the conduct of the second would likely result in injury, then the conduct of both parties combine and both are a proximate cause.
 {¶ 41} "If the conduct of the second party was not foreseeable, and the immediate cause of the injury was the conduct of the second party, then the conduct of the first party, the Defendant in this case, was not a proximate cause.
 {¶ 42} "If an independent and responsible party was aware of the existence of a hazard and could have eliminated it, there is a break in the chain of causation, and the party who created the original hazard is relieved from liability because of such intervention." (Tr. 1725-26).
 {¶ 43} The Ohio Supreme Court has held that "in a products liability case based upon the theory of strict liability in tort, the defense of intervening causation may be invoked to avoid liability where the intervening cause is unforeseeable and is the proximate cause of the injury or damage." R.H. Macy Co., Inc. v. Otis Elevator Co.
(1990), 51 Ohio St.3d 108, 112. In Macy, the defendant requested that the trial court give a superseding intervening cause instruction, almost identical to the instruction in this case. The court refused to give the instruction. On appeal, the Ohio Supreme Court, while noting that contributory negligence has no place in a strict products liability case, stated the defendant's proposed jury instruction on intervening cause would not have allowed the jury to compare the negligence of the parties or their relative degrees of fault. Id. at 111. It reasoned that the proposed instruction left no room for a comparison of fault but only would have allowed the jury to consider whether the defendant proximately caused the injury or whether some other act or omission proximately caused the injury. Id. at 111-12. The court noted that if the plaintiff's acts or those of someone else merely contributed to the defendant's act or omission, without removing the effect of the defendant's act or omission, then the defendant was completely liable for the damages. Id. at 112. However, if the plaintiff's or someone else's act completely eliminated the effect of the defendant's act or omission, then the defendant was not liable. Id. Finally, the court pointed out that the defendant's proposed instruction limited the jury to considering only those causes that were unforeseeable. Id.
 {¶ 44} The instruction in the present case, like the instruction in Macy, limited the jury to only consider those causes that were not reasonably foreseeable. Therefore, if the jury believed appellant's argument that someone drinking and/or falling asleep and/or passing out in a running car with their foot on the accelerator is a reasonably foreseeable event, then they were precluded from considering this as a superseding intervening cause. As a reviewing court, we are to presume that the jury followed the court's instructions. State v. Sibert (1994),98 Ohio App.3d 412, 425; Pang v. Minch (1990), 53 Ohio St.3d 186, paragraph four of the syllabus. Therefore, if the jury found that Gary's act of drinking and falling asleep in the Laser was reasonably foreseeable then it did not consider that act as a superseding intervening cause and did not find in favor of appellee based on this defense. Whether the act of drinking, taking antihistamines, and falling asleep in a running automobile while pressing down on the accelerator is a reasonably foreseeable act is a question best left to the trier of fact.
 {¶ 45} Appellant cites to numerous D.U.I. cases where the automobile operator passed out asleep in his car with the engine running and several D.U.I. cases where the operator passed out in his vehicle with the engine running and his foot on the accelerator. See State v.Brletich (June 28, 2000), 7th Dist. No. 98-CO-84; State v. Barth (June 2, 2000), 11th Dist. No. 99-L-058; State v. Boys (1998),128 Ohio App.3d 640; State v. Schuller (Apr. 20, 1992), 12th Dist. No. Ca91-08-019; State v. McGlone (1991), 59 Ohio St.3d 122; Columbus v.Moccabee (Nov. 18, 1987), 10th Dist. Nos. 87AP-456 and 87AP457; State v.Cleary (1986), 22 Ohio St.3d 198; State v. Heffelfinger (Oct. 9, 1985), 9th Dist. No. C.A. 2028. While these cases may indicate that people do drink and fall asleep in their vehicles with the engine running, they do not demonstrate that such is a reasonably foreseeable occurrence. Although people may engage in a certain behavior on occasion, such behavior does not necessarily rise to the level of being reasonably foreseeable. Nor should we expect manufacturers to guard against every possible way a person may use its product.
 {¶ 46} Since evidence exists on the record which would allow reasonable minds to reach the conclusion that Gary's drinking, taking antihistamines, and falling asleep in a running automobile while pressing down on the accelerator was the proximate cause of his injury and subsequent death, the instruction on superseding intervening cause was not an abuse of discretion by the trial court. Therefore, appellant's second assignment of error is without merit.
 {¶ 47} Appellant's third assignment of error states:
 {¶ 48} "The judgment for Chrysler is not sustained by the weight of the evidence and is contrary to law."
 {¶ 49} Appellant argues that the jury's verdict was against the manifest weight of the evidence. He contends there was no evidence that the Laser was altered in any way from the time it was delivered to Gary on October 1, 1992. He asserts that the Laser was defective because its exhaust cross-pipe was unshielded. Appellant notes that all cause and origin experts agreed the fire began under the Laser behind the rear passenger's footwell. He also states that the cause and origin experts agreed combustibles, including a rubber plug, rubber exhaust hangers, and rubber sheathing were the probable ignition sources. Appellant further states that all agreed the exhaust cross-pipe was the only portion of the exhaust system that was unshielded. He also notes that all agreed the fire started near the exhaust cross-pipe and the cause of the fire was heat from the unshielded cross-pipe. Appellant also notes that he presented two alternative theories of how the exhaust system overheated: (1) an engine control malfunction which heated the exhaust system to a high temperature coupled with additional heat in the area of the cracked resonator weld; or (2) a defective design of the electronic fuel injection system and catalytic converter causing the exhaust system to superheat.
 {¶ 50} Appellant presented expert witness Gil Kurop who testified that the Laser's design was defective because unlimited operation at rev limiter by sustained full throttle application would quickly increase the exhaust system temperature and present a certain fire hazard for an unshielded cross-pipe. (Tr. 723-36). He testified that inadequate shielding, the placement of the drain hole, the use of rubber in close proximity to the cross-pipe, and the parking brake placement above the unshielded cross-pipe were design defects. (Tr. 723-36). Kurop also testified that it is foreseeable that a person would sit in a car for an extended period of time and fall asleep with the engine running. (Tr. 741). He testified it is foreseeable that people operate automobiles while intoxicated and consume alcohol in autos. (Tr. 741-42). Kurop next testified that from an engineering point of view, Gary's operation of the Laser at such high RPMs may have been abuse but it was not misuse and that such abuse was foreseeable. (Tr. 752-53).
 {¶ 51} A judgment supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. Willett v. Felger
(Mar. 29, 1999), 7th Dist. No. 96-CO-40; Gerijo, Inc. v. Fairfield
(1994), 70 Ohio St.3d 223, 226. Furthermore, in considering whether the judgment is against the manifest weight of the evidence, it is important that this court be guided by a presumption that the findings of the trier of fact are correct. Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80. If the evidence is susceptible to more than one interpretation, we must construe the evidence consistently with the trial court's judgment. Gerijo, 70 Ohio St.3d at 226.
 {¶ 52} The jury considered both a design defect claim and a failure to warn claim. Under the design defect claim, appellant was required to meet one of two tests.
 {¶ 53} The risk-benefit test requires the plaintiff to prove: "When [the product] left the control of its manufacturer, the foreseeable risks associated with its design or formulation * * * exceeded the benefits associated with that design or formulation * * *." R.C.2307.75(A)(1).
 {¶ 54} The consumer expectation test requires the plaintiff to prove: "[The product] is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." R.C.2307.75(A)(2).
 {¶ 55} In addition to proving one of the above claims, appellant was required to prove that the alleged defect was the proximate cause of Gary's injury and subsequent death. R.C. 2307.73(A)(2).
 {¶ 56} Appellant is correct in his statement that all experts believed the origin of the fire was underneath the Laser behind the rear passenger footwell. He is also correct in his statement that the experts agreed that combustibles under the car were the probable source of ignition. Nonetheless, competent, credible evidence exists on the record that the 1992 Plymouth Laser was not defective in its design.
 {¶ 57} Defense expert, Paul Beauchamp, testified that operating a vehicle at full throttle for any significant period of time is an unforeseeable abuse of the vehicle. (Tr. 1155). Defense expert, Mark Noble, a former executive engineer at Chrysler, testified that additional shielding of the exhaust system in Gary's Laser was not necessary to make the car reasonably safe. (Tr. 1378). Noble also testified that the amount of exhaust shielding in the 1992 Laser was adequate as designed. (Tr. 1378). Defense expert, Robert Beauchamp, testified that a 1992 Laser would have to run at rev limiter for at least seven to 20 minutes before it would heat the combustibles under the car to auto-ignition temperature. (Tr. 1296). Noble testified that operating a vehicle at rev limiter for eight minutes while the vehicle is stationary is an abuse that is not reasonably foreseeable. (Tr. 1387).
 {¶ 58} Although a manufacturer is not responsible for all product misuses, the manufacturer's failure to design a product to prevent a foreseeable misuse can be a design defect. Welch Sand Gravel, Inc.v. O K Trojan, Inc. (1995), 107 Ohio App.3d 218, 224; Menifee v.Ohio Welding Products, Inc. (1984), 15 Ohio St.3d 75. Furthermore, a manufacturer need not anticipate all product uses nor need it guarantee the product is incapable of causing injury in all of its possible uses.Welch, 107 Ohio Ap.3d at 224; Menifee, 15 Ohio St.3d at syllabus. Appellee produced competent, credible evidence by way of its experts' testimony that the operation of the stationary Laser at rev limiter was an unforeseeable misuse. It also provided an expert opinion that the Laser, as designed, was not defective. Thus, appellant's weight of the evidence argument must fail regarding his design defect claim.
 {¶ 59} In order to prove a failure to warn claim, the plaintiff must prove that when the product left the control of its manufacturer, both of the following applied:
 {¶ 60} "(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 61} "(b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm." R.C. 2307.76(A)(1).
 {¶ 62} As to appellant's failure to warn claim, appellee presented the following competent, credible evidence. Noble testified that no warning was required for the situation that occurred with Gary's Laser because it should have been obvious from the situation (i.e., foot all the way down on the accelerator, excessive noise like the engine is going to explode) that one should not operate the car at rev limiter for any extended period of time. (Tr. 1492-94). Additionally, although the Laser's owner's manual does not provide a warning that the exhaust system may auto-ignite if operated at rev limiter while stationary for a certain amount of time, it does contain the following information and warning: "[The tachometer] also assists in evaluating engine performance. The red zone indicates an engine speed in excess of safe operation. Select the correct gear to control the engine speed so that the tachometer indicator does not enter the red zone." (Plaintiff's Exhibit 8, p. 36). Thus, appellant's argument must also fail regarding his failure to warn claim.
 {¶ 63} Accordingly, appellant's third assignment of error is without merit.
 {¶ 64} Appellant's fourth assignment of error states:
 {¶ 65} "The court prejudicially erred in overruling Griffith's several pre-trial and trial motions and in permitting evidence of beer, blood alcohol reading and/or traces of diphenhydramine in Griffith's blood stream, and further prejudicially erred and abused its discretion in permitting cross examination of plaintiff's witnesses and direct examination of Chrysler's witnesses on these matters."
 {¶ 66} Appellant claims the trial court erred in admitting evidence of Gary's blood alcohol and diphenhydramine levels. He contends such evidence was irrelevant, since this was a strict product liability case. Appellant argues the focus in this case should have been on the safety of appellee's product, not on Gary's intoxicated state. Appellant notes he objected to this evidence many times before, during, and after trial. Alternatively, appellant argues the danger of unfair prejudice, confusion of the issue, and misleading the jury outweighed the evidence's probative value.
 {¶ 67} Appellee asserts appellant waived his objection to the introduction of Gary's blood alcohol and diphenhydramine levels by introducing this evidence first at trial. Appellant filed several pre-trial motions in limine asking the court to exclude such evidence. The court denied these motions ruling that appellee could introduce evidence of Gary's blood alcohol and diphenhydramine levels for the limited purpose of demonstrating its theory of unforeseeable misuse and why Gary would have run his stationary car at rev limiter for over seven minutes. The court further ruled that appellee could not use the evidence to show that Gary was comparatively negligent because he was under the influence or that Gary was over the legal limit of .10. (September 7, 1999 Judgment Entry).
 {¶ 68} Appellant's motions in limine, however, did not preserve his objection on appeal, absent proper preservation during the trial. A motion in limine seeks only a preliminary ruling. Therefore, at trial, the proponent of the evidence must actually move the court to admit the evidence, whereas the party opposing the evidence must object at that time in order to properly preserve the question for appeal. Krotine v.Neer, 10th Dist. No. 02AP-121, 2002-Ohio-7019, at ¶ 10; State v.Maurer (1984), 15 Ohio St.3d 239, 259-260. A party's failure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion in limine. Kovshovik v.Mandik (Sept. 29, 1999), 7th Dist. No. 97 CA 41; State v. Grubb (1986),28 Ohio St.3d 199, 203. "[A] decision on a motion in limine is a pretrial, preliminary, precautionary, tentative, anticipatory ruling on the admissibility of evidence." State v. Vaughn, 7th Dist. No. 683,2002-Ohio-5046, at ¶ 18.
 {¶ 69} Appellant first brought up the issue of Gary's alcohol consumption during opening arguments. (Tr. 345, 349, 351, 356). Appellant's counsel made statements such as:
 {¶ 70} "And he [Gary] was in the car with beer." (Tr. 345).
 {¶ 71} "* * * Ron Pucci * * * did not mention, at all, any opinion that Gary was under the influence of an alcoholic beverage." (Tr. 349).
 {¶ 72} "How could we imagine somebody was sitting in our car, sleeping, at night, or listening to the radio, at night, after having drank some beers and having a point one five percent blood alcohol reading, * * *." (Tr. 355-56).
 {¶ 73} Appellant also first questioned a witness regarding Gary's blood alcohol level. On direct examination, appellant asked Dr. Harvey Slater, Gary's surgeon, what was Gary's blood alcohol level when he was screened at West Penn Hospital. (Tr. 888-89). Dr. Slater testified at that time Gary's blood alcohol level was .086. (Tr. 888). Dr. Slater also testified on direct examination that he found trace amounts of Benadryl in Gary's system. (Tr. 894).
 {¶ 74} Appellant claims that appellee first raised the alcohol issue on cross-examination of Lori Heaton, a paramedic at the scene of the fire. Appellee asked Ms. Heaton whether Gary told her if he had anything to drink that night, to which she responded "no." (Tr. 424). Additionally, during appellee's direct examination of Dr. Forney, the toxicologist, the court granted appellant a continuing objection to appellee's line of questioning regarding what Gary's alcohol and diphenhydramine levels were at the time of the fire. (Tr. 1039).
 {¶ 75} Hence, whether appellant waived this issue on appeal depends on which party we determine introduced evidence of Gary's alcohol and diphenhydramine levels first. While appellant made the first mention of Gary's intoxication in his opening statement, opening statements are not evidence. State v. Frazier (1995), 73 Ohio St.3d 323, 338. Since opening statements are not evidence, appellant did not introduce evidence of Gary's intoxication at that point. The next time Gary's intoxication was mentioned was by appellee when it asked Ms. Heaton whether Gary told her if he had anything to drink. Appellant did not object to this question. The next time either party raised Gary's intoxication was by appellant in the direct exam of Dr. Marwin Yanes, Gary's emergency room physician. Appellant asked Dr. Yanes if he ran any alcohol tests on Gary, to which he responded "no." (Tr. 451). Appellant also asked Dr. Yanes if he smelled any alcohol on Gary or if he noticed if Gary slurred his speech, to which he responded "no." (Tr. 451). Given appellant's failure to object to appellee's question to Ms. Heaton and the questions appellant asked Dr. Yanes, appellant opened the door to questions regarding Gary's intoxication, thus waiving his objection on appeal.
 {¶ 76} Hence, appellant's fourth assignment of error is without merit.
 {¶ 77} Appellant's fifth assignment of error states:
 {¶ 78} "The court prejudicially erred by granting Chrysler's motion for a directed verdict at the end of appellant's case on appellant's claim of a manufacturing defect in the nature of a defective weld that caused a crack between the second resonator and the tail pipe that permitted hot gases to escape which were a contributing or assisting cause of the fire in the over heated exhaust system."
 {¶ 79} Appellant argues that the court erred in granting appellee a directed verdict on his manufacturing defect claim. Appellant claims that Al Orringer's testimony supported the manufacturing defect theory. He asserts that although Orringer, a forensic automotive consultant, never used the words "proximate cause" when testifying about the cracked resonator weld, the court was obligated to consider his testimony as a whole. Citing, Morris v. Wooster Iron Metal Co. (Mar. 23, 1994), 9th Dist. No. 2843. Appellant alleges it is evident from Orringer's testimony that he opined the cracked resonator weld was a manufacturing defect and that the defect contributed to the heat, which led to the fire.
 {¶ 80} An appellate court reviews a trial court's ruling on a motion for directed verdict de novo because it presents a question of law. Pearn v. Daimler Chrysler Corp. (2002), 148 Ohio App.3d 228, 240. A motion for directed verdict tests the sufficiency of the evidence at trial, not the weight of such evidence or the credibility of witnesses. Id. The court shall grant a motion for a directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." Civ.R. 50(A)(4).
 {¶ 81} In the present case, the trial court, upon granting appellee's motion for a directed verdict, stated, "[t]here is no testimony at all that the weld was the proximate cause of anything. It contributed, but not a proximate cause." (Tr. 965-66). At the end of trial, the court also excluded the previously admitted service bulletin from evidence. It reasoned that the service bulletin might bring back the issue of whether a manufacturing defect existed. (Tr. 1620-21).
 {¶ 82} In order to prove a manufacturing defect, appellant had to present evidence that: (1) the defect existed at the time the Laser left appellee's hands; (2) the Laser deviated in a material way from the manufacturer's design specifications, formula, or performance standards, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards; and (3) the defect was a direct and proximate cause of Gary's injury and death. R.C. 2307.74; R.C. 2307.73(A)(2).
 {¶ 83} Although Orringer concluded that the cracked resonator weld existed when the Laser left the manufacturer, no evidence exists to support his conclusion. (Tr. 611-15). Orringer did not first examine Gary's Laser until almost nine months after the fire. (Tr. 585). Orringer then had the Laser towed to his facility in Pittsburgh so he could examine it further. (Tr. 587). It was at this time that Orringer noticed the crack in the resonator weld. (Tr. 611). Additionally, Orringer admitted on cross-examination that if the crack had existed before the fire, it may have caused excessive exhaust noises. (Tr. 643-44). Two witnesses who observed the Laser shortly before the fire testified they did not notice anything unusual about the car. (Tr. 511, 817-19). Furthermore, James Blackhurst, a Lisbon Fire Department investigator, testified that he inspected the Laser on the day of the fire and he did not see any cracks in the exhaust system. (Tr. 559).
 {¶ 84} Furthermore, appellant failed to present any evidence that the alleged manufacturing defect was the direct and proximate cause of Gary's injury and subsequent death. Appellant alleges that Orringer testified the cracked resonator weld contributed to the heat, which led to the fire. Orringer did testify that the second resonator had a failed weld. (Tr. 611). He testified that the cracked resonator weld would allow more heat to the area of the fire's origin, which would assist in the fire. (Tr. 616). Furthermore, Orringer testified the separation due to the failed weld would allow exhaust gases to escape. (Tr. 615, 656). The escaped gases would then contribute to the under-car temperature. (Tr. 615, 656). Orringer testified that these gases were hot enough to have a significant impact on the under-car temperature on the night of the fire. (Tr. 656). He stated that even if the under-car temperature was lower than that which appellee's test demonstrated, there would still be sufficient temperatures to ignite the combustibles under the car. (Tr. 657). But appellant never asked, and Orringer never testified whether the cracked resonator weld was a proximate cause of the fire. In fact, Orringer testified that in his opinion the failure to shield the cross-pipe together with the presence of the rubber combustibles was the proximate cause of the fire. (Tr. 603-604).
 {¶ 85} Additionally, appellant failed to present evidence that the Laser deviated from its design specification, formula, or performance standards. Appellant introduced a technical service bulletin from Chrysler for 1989 to 1992 Plymouth Lasers and Talons issued just days after the fire. It identified a problem with the separation at the back of the resonator that caused a noise problem. (Plaintiff's Exhibit 154). The bulletin stated that the cars "may exhibit a noise/exhaust leak." (Tr. 651-52). The court ultimately excluded the bulletin from evidence because it reasoned that admitting it would bring up the manufacturing defect claim on which it had already granted a directed verdict. However, appellant never introduced any evidence of the Laser's design specification, formula, or performance standards.
 {¶ 86} Even in construing the evidence in the light most favorable to appellant, it is not possible to conclude a manufacturing defect existed that proximately caused the fire. Orringer never stated the failed weld was a proximate cause of the fire, nor did appellant present evidence of the Laser's design specifications. Thus, appellant's fifth assignment of error is without merit.
 {¶ 87} Appellant's sixth assignment of error states:
 {¶ 88} "The court abused its discretion and materially prejudiced the appellant by granting Chrysler's motion in limine and overruling appellant's offering into evidence of any or all of plaintiff's exhibits 97 through 128, which were duly certified and authenticated copies of automotive patents that discussed exhaust system shielding, exhaust system temperature problems caused by the catalytic converter, overtemperature control, overtemperature warning and rev limiter problems."
 {¶ 89} Appellant argues that the trial court erred in granting appellee's motion in limine to exclude Plaintiff's Exhibits 97 through 128. Exhibits 97 through 128 are patents concerning exhaust systems. Appellant asserts that he did not learn of appellee's test on an exemplar Laser until appellee's experts' depositions, long after his experts' depositions. Appellant alleges that it was not until this time that he understood the breadth and scope of the Laser's design defect. It was at this time that appellant learned of the Laser's propensity to attain temperatures in excess of 1,000°F within one minute and 48 seconds of full throttle application. He asserts that this knowledge pointed out the importance of full shielding and also called into question the electronic fuel injection and emission control system as being the reason such high temperatures were attainable. Appellant contends that this late discovery prejudiced his efforts to find technical information.
 {¶ 90} As a result, he began a search for helpful technical evidence. He claims he did not discover the patents until late August/early September 2000. He further claims he presented the patents to appellee and the court as soon as he could. Appellant also wrote a letter to the court explaining his search for the patents and why he obtained them so late.
 {¶ 91} Appellant contends that the court should have admitted the patents into evidence, allowed appellant's experts to illustrate the defect of the Laser with patents, and allowed appellant to cross-examine appellee's experts with the information in the patents. Appellant argues the patents are relevant per Evid.R. 401 since the patents recognize problems with superheated exhaust components and patented various types of heat shields to protect vehicles' occupants.
 {¶ 92} A trial court has broad discretion concerning the admission and exclusion of evidence, and a reviewing court shall not disturb the trial court's ruling unless a clear abuse of discretion is established.W. Coast Indus. Relations Assn., Inc. v. Superior Beverage Group, Ltd.
(1998), 127 Ohio App.3d 233, 242.
 {¶ 93} The trial court ruled on appellee's motion in limine to exclude the patents before proceeding with the trial. It excluded the patents both based on relevancy and late discovery. (Tr. 27).
 {¶ 94} We must examine this issue by separating the patents into two separate groups, those that pre-date the fire and those that post-date the fire. The fire occurred on October 26, 1992. Of the 32 patents, 16 post-date the fire (Plaintiff's Exhibits 99, 100, 106, 107, 108, 109, 113, 116, 121, 122, 123, 124, 125, 126, 127, 128) and 16 pre-date the fire (Plaintiff's Exhibits 97, 98, 101, 102, 103, 104, 105, 110, 111, 112, 114, 115, 117, 118, 119, 120). The patents have various inventors and assignees.
 {¶ 95} Regarding the post-dating patents, there is no question that the trial court acted within its discretion in excluding them from evidence. "Relevant evidence" is any evidence that tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401. Generally, all relevant evidence is admissible. Evid.R. 402. Evidence that is not relevant is not admissible. Evid.R. 402. If the patents post-dated the fire, appellee did not have this information/technology available to it before the fire. Thus, the post-dating patents were irrelevant.
 {¶ 96} The pre-dating patents require further analysis. Appellant points our attention to the content of several of the pre-dating patents. For instance, Plaintiff's Exhibits 117, 118, 119, and 120 concern automotive shielding to protect vehicles from heat an exhaust system can generate. U.S. Patent 4,085,816, issued April 25, 1978, states the following as part of its summary: "It is an object of the present invention to provide a new heat shielding apparatus which is fixed around an exhaust tube of an internal combustion engine for effectively shielding heat radiation from the exhaust tube when the engine is running." (Plaintiff's Exhibit 117). U.S. Patent 4,478,310, issued October 23, 1984, discusses the background of its invention, a universal heat shield. It states: "Additionally, heat shields have become popular on ordinary passenger vehicles due to the wide use of catalytic converters which tend to become very hot under certain circumstances." (Plaintiff's Exhibit 118). The other patents concern such things as RPM limiters, temperature limiters, and overheating. For example, U.S. Patent 4,667,632, issued May 26, 1987, provides as background for its invention: "This invention relates to an apparatus for controlling the revolutions * * * of an internal combustion engine which serves to feedback-control a no-load RPM of the internal combustion engine to a predetermined RPM." (Plaintiff's Exhibit 115).
 {¶ 97} At trial appellant argued, among other things, that Gary's Laser was defectively designed because it should have been equipped with a heat shield over the area of the exhaust where the fire started, and/or a RPM limiter which would prevent a motorist form operating a stationary car at rev limiter for an extended time. The subject matter of the pre-dating patents is relevant to appellant's theories as to what type of technology was available to appellee. But it is difficult to discern whether these highly technical patents would have helped to prove a fact at issue in the case without some sort of expert explanation.
 {¶ 98} Even though the pre-dating patents appear relevant to the case, the trial court did not abuse its discretion in excluding them for the following reasons. First, the parties had long since completed discovery. Second, appellant did not disclose the patents until ten days before trial. Third, the parties had deposed all experts and they had no knowledge of the patents at the time of the depositions. So they were precluded from deposing the experts with the patents. Fourth, the patents are highly technical. Thus, it would be prejudicial to appellee to have to interpret them in less than two weeks before trial. Fifth, had appellee known about the patents in a more timely manner, it may have wished to obtain an expert who specialized in automotive patents.
 {¶ 99} Accordingly, appellant's sixth assignment of error is without merit.
 {¶ 100} For the reasons stated above, the trial court's decision is hereby affirmed.
Judgment affirmed.
Vukovich and Waite, JJ., concur.
[1] Diphenhydramine is an antihistamine and the active ingredient in Benadryl. The amount found in Gary's blood was less than the therapeutic range of .05 to .10 micrograms per millimeter. (Tr. 1095).