[Cite as *Zirkle v. N.E. Ohio Med. Univ.*, 2025-Ohio-2173.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| DEXTER ZIRKLE | Case No. 2023-00433JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| NORTHEAST OHIO MEDICAL UNIVERSITY | |
| Defendant | |

{¶1} Plaintiff brought this action alleging that he was injured from being exposed to an excessive amount of formaldehyde in a cadaver that defendant supplied to Kent State University, where he was enrolled in a Ph.D. program and worked as a teaching assistant. Plaintiff seeks relief under the Ohio Products Liability Act, R.C. 2307.71, et seq. The case proceeded to trial. As explained below, judgment is recommended for defendant.

**Summary of Testimony**

{¶2} Plaintiff testified that in spring 2019 he was in the doctoral candidate phase of his Ph.D. program in biomedical sciences, having completed all his coursework and passed comprehensive exams, leaving him to work on his dissertation research and serve as a teaching assistant. Plaintiff described the course that he taught in the spring 2019 semester in the gross anatomy lab in Cunningham Hall at Kent State University, and how there were four cadavers in the lab that semester, one of which was assigned for use by him and his students; the other three were assigned to three other teaching assistants. Plaintiff explained that the cadavers used at Kent State University were supplied by defendant and were delivered early each semester, at which time he or another teaching assistant would help transport them from the loading dock to the gross anatomy lab; the cadavers arrived in zipped body bags and were placed on semi-stationary gurneys in the lab, and then a cover was placed over each gurney. Plaintiff stated that the cadavers were supplied primarily for use in the gross anatomy lab course; though he did not ask

defendant for permission to conduct his own dissertation research on the cadaver in question, he understood that it could be used for that purpose so long as this did not interfere with its primary educational purpose.

{¶3} There were 18 to 20 students in the gross anatomy lab course in the spring 2019 semester, and in a typical class plaintiff would perform some dissection and describe what he was doing, and then he would give the students relatively simple assignments to perform some dissection themselves, he stated.  Plaintiff recounted that the students wore lab coats, latex or nitrile gloves, and protective eyewear, all of which were required under the course syllabus, which also provided that students could wear respirators for additional protection.  (Defendant's Exhibit H.)  Plaintiff acknowledged that there is an inherent risk of chemical exposure when dissecting a cadaver, as the cadavers contain embalming chemicals that are known to cause respiratory irritation and other harm, and the syllabus warned of these risks.

{¶4} At the beginning of the semester, plaintiff explained, he generally began the gross anatomy lab course by dissecting the head, followed by the upper limbs and back.  Plaintiff testified that as the semester progressed, there came a point in March 2019 when the dissection moved to the thorax region and he observed that this cadaver contained more fluid than what he was used to seeing, but it did not concern him and he removed the fluid without incident.  As plaintiff explained, the cadavers that he had worked with in the past contained varying amounts of fluid, typically in the thorax and abdomen, and the practice at Kent State University was to remove such fluid with paper towels so as to reduce the fumes given off by embalming chemicals and to allow the students to better see inside the cadaver.  Every cadaver has anatomical variations and different amounts of fluid inside, plaintiff acknowledged.  Plaintiff testified that the fluid he observed in March 2019 did not concern him.

{¶5} On March 5, 2019, plaintiff emailed the professor to whom he reported—Dr. Brian Grafton—to provide an update about the status of the course and the dissection, including that in the most recent dissection there were "tons of fluid (I got us TONS of paper towels as a result) . . . ."  (Defendant's Exhibit I.)  In another email to Dr. Grafton on April 2, 2019, plaintiff again provided an update, noting that he had gone to the lab the previous day "to prep and drain more fluid from my cadaver" and, apart from a couple of

unrelated issues, the "lab is going well (just an overly filled-with-preservative cadaver)." (Defendant's Exhibit J.)

{¶6} Plaintiff testified that on or about April 14, 2019, he visited the lab both to prepare the cadaver for an upcoming class and to perform research on the cadaver for his dissertation. Plaintiff specified that he dissected the abdominal and pelvic region that day. Plaintiff stated that although he had observed higher than usual volumes of fluid in this cadaver and expected to find fluid in the abdominal cavity, he did not take any extra precautions. Upon opening the abdominal cavity, plaintiff recalled, he observed more fluid than he had seen before in the five or six cadavers with which he had previously worked.

{¶7} Plaintiff estimated that he spent about five and a half hours dissecting the cadaver that day, which he characterized as a relatively long duration. Plaintiff stated that although he took some short breaks, for most of that time he was in close proximity to the cadaver, and he explained that, because of his height (6' 5"), he sat down or bent down for some of that time.

{¶8} For a while that day, plaintiff was aided by a colleague, Elliott Sommer, and the two of them worked together to remove fluid from the cadaver, plaintiff recalled. Plaintiff explained that they initially soaked up some of the fluid with paper towels, then plaintiff scooped fluid out with a cup before Sommer retrieved large syringes to draw out more fluid, all of which they placed in a biowaste container. Plaintiff felt that the fluid was embalming fluid based upon its texture, appearance, and smell, although he later stated that the smell was to be expected. In plaintiff's opinion, the cadaver was "overfilled" with embalming fluid, although he admittedly had no embalming experience.

{¶9} When he finished dissecting, plaintiff recalled, he closed the body bag and the cover atop the gurney and went to the washroom, where he removed his protective equipment and washed his hands with soap and water. Plaintiff testified that he began to have a burning sensation in his eyes and nasal area, and he discovered painful red rashes on his wrists in the area that had been exposed between his gloves and lab coat.

{¶10} Over the next several days, plaintiff recalled, he developed a burning sensation in his throat and chest and felt like his airways were constricting. Plaintiff went to an urgent care facility about a week after the incident, by which time he had severe

chest pain when inhaling, he stated.  At this visit, plaintiff testified, he received a nebulizing treatment to open the airways and a prescription for five or six days' worth of prednisone, a steroid medication.

{¶11} Plaintiff testified that on April 29, 2019, he emailed Dr. Grafton to let him know about the matter, and the following day he emailed Mary Ann Raghanti, Professor and Chair of the Department of Anthropology, about the matter, and upon her recommendation he prepared an incident report.  (Defendant's Exhibits K, L.)

{¶12} Despite his ongoing issues, plaintiff stated, he continued working with the cadaver and dissected the lower limbs.  Indeed, plaintiff stated that in May 2019, as the time drew close to when defendant was scheduled to retrieve the cadavers it had supplied to Kent State University that semester, he wanted to keep the cadaver longer so that he could complete more research for his dissertation.  Plaintiff emailed an employee of defendant about this and explained, regarding the cadaver in question, that he felt "the lingering fumes (and the duration of my dissection) just made this one difficult." (Defendant's Exhibit N.)  In an email with Kent State University faculty around the same time, plaintiff discussed his desire to continue working with the cadaver, admitting that "[m]y skin, breathing, and overall health is always sensitive to everything, especially caustic chemicals", and explaining that he felt his issues derived, in part, from being in close proximity to the fluid in the cadaver during "a long duration dissection." (Defendant's Exhibit O.)  Plaintiff also admitted that he had a history during past dissections of irritation from such fluids in the area of exposed skin between his gloves and lab coat. (Defendant's Exhibit O.)  When asked at trial about his desire to continue working with the cadaver, plaintiff stated that he did not realize the extent of his injuries at that time. Plaintiff also stated that he never requested for defendant or Kent State University to perform any testing on the cadaver, and, he added, all the fluid was already removed by this time anyway.  Plaintiff stated that he did receive at least one extension from defendant on how long the cadaver could remain at Kent State University, and he sought another extension, but ultimately when an agent of defendant came to retrieve the other cadavers, the cadaver in question was removed as well, apparently before plaintiff understood that it would be removed.

{¶13} Regarding his symptoms, plaintiff testified that the medication he received from his urgent care visit provided relief, but when the prescription ran out the symptoms returned. Plaintiff stated that he sought further medical attention and came to be referred to a pulmonologist, Dr. Charles Fuenning, who prescribed inhalers and prednisone, similar to what the urgent care provider prescribed. As he continued treating with Dr. Fuenning, plaintiff recalled, he was also prescribed a nebulizer to use when symptoms flared up. Plaintiff understood that the diagnosis he received from Dr. Fuenning was reactive airway syndrome due to toxic exposure, and he was instructed to avoid chemical exposures that could trigger the problem. Plaintiff stated that he continues to use the medications prescribed by Dr. Fuenning.

{¶14} According to plaintiff, since the events of 2019 he has made modifications in his life to avoid or limit his exposure to certain things that trigger his airways, such as fireplaces or firepits, dust, strong smells, and occasionally cooking stoves. And plaintiff stated he can no longer work in an anatomy lab. Plaintiff related that he was able to complete his Ph.D. program in 2022, but his health status made it difficult to find a job in the career path that he was on track for in the gross anatomy field. As plaintiff recounted, he explored forensics as another potential career path but determined that it was unsuitable because it involved exposure to chemicals. Plaintiff stated that after teaching anthropology for a stint at Kent State University, he decided to shift into the medical field, but he needed to find a medical school that did not require students to study gross anatomy. Plaintiff eventually enrolled in a natural medicine program in Portland, Oregon, where he is now in his second year of study, he stated.

{¶15} Elliot Sommer testified that he is now an Assistant Professor of Bioscience, teaching at both North Central State College and Oberlin College, but in 2019 he was studying at Kent State University and knew plaintiff through plaintiff's work as a teaching assistant. Sommer stated that he was present when the dissection of this cadaver commenced earlier in the semester, and he recalled it being a large male cadaver with a high degree of fat. On the day in question, on or about April 14, 2019, Sommer came to the lab to assist plaintiff with preparing the cadaver for an upcoming class, he stated.

{¶16} Sommer recalled that they focused on the abdominal/pelvic region that day, and that when they opened the abdominal cavity there was a significant amount of fluid

present, enough to submerge a hand if one reached to the bottom of the cavity. Sommer stated that he had been involved in dissections of approximately eight cadavers previously, but had apparently only opened one abdominal cavity, and he acknowledged having no experience embalming cadavers.

{¶17} According to Sommer, it is common for there to be fluid inside a cadaver, typically in a quantity that can be sopped up with about one quarter of a roll of paper towels. But with this cadaver, Sommer recalled, he and plaintiff used "reams" of paper towels and they also removed several 60-milliliter syringes full of fluid. Sommer testified that he was present in the lab for close to two hours before leaving for other obligations and when he left plaintiff was still removing fluid from the cadaver. Sommer did not experience any respiratory or skin complaints afterward, he stated.

{¶18} Charles R. Fuenning, M.D. testified by way of deposition.[1] (Plaintiff's Exhibit 10.) Dr. Fuenning detailed his education, training, and professional experience, including board certification in internal medicine, pulmonary diseases, and critical care, and stated that he practices pulmonary critical care at Western Reserve Hospital in Cuyahoga Falls, Ohio.

{¶19} Dr. Fuenning recounted first seeing plaintiff on June 7, 2019, from a referral by plaintiff's primary care physician. Plaintiff's chief complaints then were chest pain, shortness of breath, a cough, and some wheezing, Dr. Fuenning stated. Dr. Fuenning described taking a medical and occupational history from plaintiff that revealed no underlying lung issues, nor any baseline cough or wheeze. Dr. Fuenning understood from this history that plaintiff was exposed in April 2019 to what plaintiff felt was an excessive amount of formaldehyde in a cadaver, that several hours later plaintiff developed skin irritation, eye irritation, nasal burning, and sore throat, and that the symptoms progressed to chest tightness, cough, and shortness of breath. Dr. Fuenning further understood that plaintiff visited an urgent care facility where he received steroids and an albuterol inhaler, and though his symptoms improved with steroids, the symptoms returned when the steroids ran out. Plaintiff then saw his primary care physician and

---

[1] The objections set forth in the deposition transcript on pages 14 and 15 are SUSTAINED.

received an inhaled corticosteroid, used twice daily, but symptoms persisted through the time when plaintiff came to see Dr. Fuenning, he stated.

{¶20} Dr. Fuenning testified that at the first visit he measured plaintiff's vital signs as being within normal limits and he did not perform any diagnostic testing. Dr. Fuenning diagnosed plaintiff during that visit as having reactive airways dysfunction syndrome (RADS), toxic effects of formaldehyde, and gastroesophageal reflux disease, he stated. According to Dr. Fuenning, RADS is diagnosed through physical examination once alternative causes are ruled out, such as smoking, allergies, or infection. Dr. Fuenning explained that the key feature of RADS is the sudden onset of respiratory symptoms, without any significant underlying problems, associated with an acute event. At that first visit, Dr. Fuenning increased plaintiff's medication doses and advised plaintiff to avoid formaldehyde, and he continued seeing plaintiff for a total of nine visits, the last one being May 6, 2024, he stated. Dr. Fuenning testified that plaintiff's medication doses fluctuated up and down over that time. At the last visit, Dr. Fuenning stated, plaintiff was improving and using less medication, and though he was still somewhat symptomatic, the symptoms were under control with medication and environmental changes. Dr. Fuenning explained that a patient with RADS typically experiences slow improvement over time, if they avoid the agent that caused the irritation.

{¶21} In Dr. Fuenning's opinion, exposure to formaldehyde on April 19, 2019, as reported to him by plaintiff, was the cause of plaintiff's RADS. Dr. Fuenning discussed what a methacholine challenge test is and how it can be used as a diagnostic tool for RADS but stated that it requires the patient to be off medication for weeks and in this case he did not order such testing because he saw no rationale for making plaintiff more symptomatic when he was already comfortable with the RADS diagnosis.

{¶22} Robert Dillon testified that he has served as Chief Embalmer for defendant for about five years and previously served as a lab assistant since his hiring in 2014. Whereas Dillon's work as a lab assistant involved more embalming, today his duties focus more on the administration of defendant's anatomical donation program, including procurement, preparation, distribution, and the return of anatomical gifts to science, he stated. Dillon stated that he is a graduate of the Pittsburgh Institute of Mortuary Science and has embalmed approximately 4,400 to 4,600 bodies. Dillon testified that he owns

and operates one funeral home in Pennsylvania, operates another in Ohio, and in addition to his work with those facilities and his embalming work for defendant, he also does trade embalming for third-party funeral homes if they have a high volume of work or need specialty assistance.

{¶23} Dillon described defendant's anatomical donation program, in which nearly all donors are preregistered, and how at the time of death he receives notification from the hospital, nursing home, police, or other entity and will obtain some basic information to determine if the deceased will be a viable donor. For a body to be accepted in the program, it should be delivered to defendant's morgue within ten hours, and then Dillon inspects it to confirm that it is suitable for the program, as there are certain criteria that make for a good donor, such as having a body mass index of about 30, having good muscle structure, and not having certain infections that could present a risk to students, he explained. If a donor is viable, the body is washed and disinfected before embalming, Dillon stated. As Dillon explained, it is the goal of defendant's donation program to learn as much as possible from each cadaver and to return as much of the remains as possible to the family, national cemetery, or other responsible party.

{¶24} Dillon testified that the goal with embalming for anatomical preservation, as in defendant's donation program, is to retain all bodily structures in their natural place and neither over embalm nor under embalm. This is a far less invasive process than funeral home embalming, Dillon explained, which is primarily cosmetic, i.e. having a goal of making the deceased appear natural and less sick or less injured, with particular focus on the hands, neck, and face. Funeral home embalming can change the underlying structures of the body to make the best possible presentation, Dillon stated. Whereas the contents of bodily cavities are aspirated in a funeral home embalming, Dillon explained, cavity aspiration is not performed in the context of anatomical preservation, as it would destroy the structure of the body.

{¶25} Dillon stated that in defendant's anatomical donation program, each cadaver is assigned a case number that is only known to Dillon and his staff, and a tag with that case number is placed on the cadaver. The cadaver goes through arterial embalming, in which the right common carotid and jugular arteries are cut and an embalming solution is pumped by a machine through the venous system, Dillon explained. According to Dillon,

the embalmer mixes the solution in a tank and the ingredients in the solution may differ depending on the composition of the cadaver, i.e. whether it is fattier or leaner, and typically about 1.5 to 2 gallons of the solution are needed.  As Dillon described, the initial arterial discharge is a mixture of blood and a little solution, and as the process continues the amount of blood in the discharge decreases and it becomes mostly solution, and then the arteries are tied off, leaving some pressure in the venous system.  Dillon stated that the cadaver rests in the morgue, which is maintained at a temperature of 60 to 64 degrees, for 24 to 48 hours to allow time for the solution to reach and preserve as much tissue as possible.  When asked about the term "overfilled" relative to a cadaver, Dillon answered that this is not a term he is familiar with and that it does not comport with arterial embalming because the venous system can only accept a certain amount of fluid.

{¶26} Dillon testified that after resting in the morgue, the cadaver is put in cold storage, where it will be visually monitored from time to time, particularly to look for mold. The cold storage space can hold up to 125 cadavers, Dillon stated, and he aims to have each cadaver complete its educational service within two years.  Dillon stated that the cadavers are typically removed from storage and put into service on a first in, first out basis, unless there is a specific reason to release a different cadaver.  While defendant uses many of the cadavers for its own students, according to Dillon, it does supply some other institutions, and during the period in question it was routine that defendant would supply Dr. Grafton at Kent State University with two females and two males every January. Dillon understood that the cadavers supplied to Kent State University were for an undergraduate anatomy course and he explained that they were usually returned in April so they could be cremated before an annual memorial service that defendant provides for the families of donors on the Monday after Mothers' Day.

{¶27} Dillon had no specific recollection of embalming the cadaver at issue in this case, nor was he aware of any reason to believe the cadaver was improperly embalmed. Dillon testified that as a cadaver decomposes, it breaks down and parts of it, such as fat, will liquify.  As the decomposition process plays out, these residual fluids from fat, organs, and elsewhere combine with embalming solution and collect where gravity or the path of least resistance take them, which is the thoracic or abdominal region, Dillon stated.  There

are several factors that can affect the rate of decomposition, including heat and humidity, according to Dillon.

{¶28} Dillon was questioned about a time in 2018, which he said lasted two weeks at most, when defendant's anatomy lab was closed to students, and he stated that the ventilation system in the lab was tested during that time.  Dillon testified that he was not involved in the testing process, but he knew that there were 33 service bays for cadavers in the lab and that when the lab reopened to students several of the bays were taken out of service due to air quality concerns at those locations within the lab.  The ventilation system in defendant's lab at that time was the original one from 1974 and needed to be replaced or improved, Dillon stated.

{¶29} David Michael Rosenberg, M.D. testified by way of deposition.[2] (Defendant's Exhibit T.)  Dr. Rosenberg provided an overview of his education, training, and experience, which includes practicing as a pulmonologist for about 44 years.  Dr. Rosenberg stated that he is licensed to practice medicine in Ohio and Kentucky, is board-certified in internal medicine, pulmonary disease, and occupational medicine, and practices at University Hospitals in Cleveland.

{¶30} At defendant's request, Dr. Rosenberg evaluated plaintiff, which he explained included reviewing plaintiff's medical records, taking a patient history from plaintiff, and examining plaintiff in his office on February 14, 2022.  At the time of the examination, Dr. Rosenberg stated, plaintiff's chief complaint was intermittent chest discomfort or tightness, and plaintiff reported having general fatigue and some coughing with phlegm in the mornings.  As part of the examination, plaintiff underwent both a pulmonary function test and a chest x-ray, Dr. Rosenberg testified.  The purpose of taking the chest x-ray was to look for structural abnormalities, Dr. Rosenberg explained, and none were seen.   Dr. Rosenberg explained that the results from the pulmonary function test were informative in that they were entirely normal, objectively showing no restriction on the ability to breathe air in, nor any obstruction on the ability to blow air out. (Defendant's Exhibit G.)   Dr. Rosenberg added that plaintiff previously underwent a

---

[2] The objections set forth in the deposition transcript on pages 43, 46, 47, 48, and 53 are OVERRULED.

pulmonary function test on May 7, 2019, and the results from that test were normal as well.  (Defendant's Exhibit C.)

{¶31} When asked about Dr. Fuenning's diagnosis of RADS, Dr. Rosenberg talked about the importance in the practice of medicine of making evidence-based conclusions, and how there are three pillars on which to diagnose asthma or RADS: (1) a long-term or acute exposure to an irritant, (2) a temporal relationship between the exposure and developing a disorder, and (3) proving the presence of bronchoreactivity.  Plaintiff met the first two pillars, but the third pillar was never established, according to Dr. Rosenberg.  To prove bronchoreactivity, Dr. Rosenberg explained, in the case of an asthma patient this can be accomplished by administering albuterol and observing a resulting improvement in pulmonary function, but for patients whose pulmonary function tests already show normal results, these patients undergo a methacholine challenge test.  Dr. Rosenberg stated that the methacholine challenge test involves having the patient inhale methacholine, which causes airways to constrict a bit rather than open up as they would with albuterol, and if there is bronchoreactivity the patient's pulmonary function will decrease more than what would be seen normally.

{¶32} While Dr. Rosenberg felt that Dr. Fuenning's care of plaintiff was within the standard of care for a pulmonologist and that two of the three diagnostic criteria were met, he opined that Dr. Fuenning's diagnosis of RADS was not supported by the third criteria, i.e. objective testing.  But Dr. Rosenberg admitted that the lack of any objective test demonstrating bronchoreactivity does not rule out the possibility that plaintiff may have indeed developed RADS; in his opinion, it simply means plaintiff was never definitively shown to have RADS.  Dr. Rosenberg stated that RADS patients usually improve over time as well, although in a significant number of patients the bronchoreactivity persists.

**Law and Analysis**

{¶33} Plaintiff brings this claim pursuant to the Ohio Products Liability Act (OPLA), R.C. 2307.71, et seq.

{¶34} "Under the OPLA, a product liability claim is defined as follows:"

a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover

compensatory damages from a manufacturer or supplier for death, physical injury to person . . . that allegedly arose from any of the following:

(a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(b) Any warning or instruction, or lack of warning or instruction, associated with that product;

(c) Any failure of that product to conform to any relevant representation or warranty.

*Grubbs v. Smith & Nephew, Inc.*, 2020 U.S. Dist. LEXIS 162317, *3-4 (S.D.Ohio Sept. 4, 2020), quoting R.C. 2307.71(A)(13). "'[W]hen the Ohio General Assembly enacted the current version of the OPLA, . . . it abrogated all common law claims relating to product liability causes of actions.'" *Parker v. ACE Hardware Corp.*, 2018-Ohio-320, ¶ 27 (2d Dist.), quoting *Evans v. Hanger Prosthetics & Orthotics, Inc.*, 735 F.Supp.2d 785, 795 (N.D.Ohio 2010).

{¶35} In this case, plaintiff's theory of relief under the OPLA is that defendant is liable as a supplier under R.C. 2307.78 for negligently supplying a cadaver that was defective (in that it allegedly contained excessive formaldehyde or other toxic chemicals) and failing to warn of the danger. "Under Ohio law, to establish that a supplier has liability for failure to warn about the dangers of a product, a plaintiff must plead and prove 'that the supplier knew or should have known in the exercise of ordinary care, of the risk of the hazard to which it failed to warn.'" *Hall v. Orthomidwest, Inc.*, 541 F.Supp.3d 802, 809 (N.D.Ohio 2021), quoting *Estate of Blandford v. A.O. Smith Corp.*, 2016-Ohio-2835, ¶ 24 (8th Dist.).

{¶36} Regarding the liability of a supplier under the OPLA, R.C. 2307.78 provides, in pertinent part, that a supplier may be subject to liability based on a product liability claim if it is established, by a preponderance of the evidence, that "[t]he supplier in question was negligent and that, negligence was a proximate cause of harm for which the claimant seeks to recover compensatory damages[.]"

{¶37} "[T]o establish actionable negligence, one seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981). "Under Ohio common law,

negligence is established where a person has knowledge of a latent defect rendering a product unsafe and fails to provide a warning of such a defect." *Tekavec v. Van Waters & Rogers, Inc.*, 12 F.Supp.2d 672, 681 (N.D.Ohio 1998), citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 325 (1977). "However, a supplier has no duty to warn of dangers that are open and obvious to the user." *Chase v. Brooklyn City School Dist.*, 141 Ohio App.3d 9, 18 (8th Dist. 2001); *see also Livengood v. ABS Contractors Supply*, 126 Ohio App.3d 464, 466 (1st Dist. 1998) ("If the dangerous nature of a product is open and obvious to the user, no duty exists to warn of the danger.").

{¶38} "Under Ohio common law, a defect is considered to exist in a product, which is not of good and merchantable quality, fit and safe for its ordinary and intended use." *Einbecker v. Gates Corp.*, 2024-Ohio-385, ¶ 21 (3d Dist.), citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 321 (1977).

{¶39} It is noted that defendant maintains the cadaver was not a "product" for purposes of the OPLA, under which the definition of product expressly "does not include human tissue, blood, or organs." R.C. 2307.71(A)(12)(b). Plaintiff, on the other hand, maintains that the cadaver, which contained a combination of chemicals that were mixed and circulated into its venous system through defendant's embalming services, was a product under the OPLA. The court need not reach a determination as to that issue, however, because even if it is assumed that the cadaver was a product, the evidence presented at trial did not establish liability on the part of defendant, as explained below.

{¶40} Upon review of the evidence presented at trial, the magistrate finds that the cadaver was not shown to be defective. Robert Dillon is a knowledgeable, experienced professional in the embalming trade who credibly testified to the routine practice in which the cadaver would have been accepted into defendant's anatomical donation program, embalmed, and maintained in cold storage before being supplied to Kent State University. Defendant's embalming process utilized an industry-standard chemical mixture that was deposited into the cadaver arterially. This is the standard method of anatomical embalming that is used on cadavers donated for educational or research purposes, and this method differs significantly from the one used in funeral embalming. Though plaintiff claims that the cadaver was "overfilled" with the embalming fluid, in an arterial embalming the venous system can only hold a certain amount of embalming fluid, and the excess

fluid leaves the venous system at the place in the neck that was opened by the embalmer; once the blood has mostly drained out from that point and the fluid being discharged is primarily embalming fluid, the veins are tied. As Dillon—the only witness trained and experienced in embalming—explained, the venous system thus cannot be overfilled. The argument plaintiff raised in closing, speculating that there was an arterial "blowout" during the embalming in which fluid exited the venous system somewhere inside the body, was unsubstantiated. There was no witness with training and experience as an embalmer in this case to criticize defendant's embalming method or otherwise indicate that this cadaver was improperly embalmed. There is simply no credible evidence that the cadaver was "overfilled" with embalming fluid, as plaintiff claims.

{¶41} Fluid normally collects in the thoracic and abdominal cavities of a cadaver that has been embalmed for anatomical purposes. Even if the abdominal cavity of this cadaver contained more fluid than plaintiff or Sommer had previously observed in a cadaver, their experience with dissecting abdominal cavities was not extensive, and the amount of fluid found in an abdominal cavity upon dissection varies from cadaver to cadaver and can be affected by several factors. The abdominal cavity is also the chief location in which fluids collect in a cadaver. The syllabus from the course that plaintiff was teaching specifically warned that fluid, including formaldehyde, collects in the abdominal cavity. This cadaver was apparently larger and contained more fat compared to the average cadaver, and during the natural decomposition process fat liquifies and collects with other fluids. Though plaintiff argues that the fluid in this abdominal cavity was formaldehyde, it is probable that the fluid was a combination of formaldehyde and other embalming chemicals, liquified fat, and other residual bodily fluids. Plaintiff did not preserve any of the fluid and there is no credible evidence demonstrating that the fluid was anything other than the collection of embalming solution and bodily substances that naturally collect in the abdominal cavities of cadavers preserved for anatomical purposes.

{¶42} While plaintiff argues that there were defects with some of the cadavers in defendant's anatomy lab in fall 2018 and that this points to there being a defect with the cadaver in this case which defendant knew or should have known about, it was not shown that the cadavers in defendant's anatomy lab in fall 2018 were unfit and unsafe for their ordinary and intended use. Nor was it shown that defendant should have performed any

sort of testing on the supply of cadavers in cold storage at that time, or removed any of those cadavers from the supply, as plaintiff suggests. After learning of respiratory complaints from one or more students at that time, defendant conducted an investigation that included third-party testing of the environmental air quality in its anatomy lab. As a result of the testing, a few of the 33 bays in the anatomy lab were taken out of service. The subject of the investigation was the air quality in the anatomy lab, not the cadavers themselves, nor defendant's embalming process. The ventilation system, which dated to 1974, was ultimately replaced. The greater weight of the evidence establishes that in fall 2018 air quality concerns were investigated and identified in defendant's anatomy lab, which was served by an aged ventilation system, but the evidence fails to establish any defect with the cadavers in defendant's anatomical donation program.

{¶43} In sum, the evidence demonstrates that the cadaver at issue in this case was fit and safe for its ordinary and intended use, and there was no negligence on the part of defendant. The ordinary risk associated with the embalming solution in the cadaver was open and obvious to plaintiff, and one for which defendant had no duty to warn.

**Conclusion**

{¶44} Based upon the foregoing, while not without sympathy for plaintiff, the magistrate finds that plaintiff did not prove his claim by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶45} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate


**Filed May 28, 2025**
**Sent to S.C. Reporter 6/20/25**